WeldoN, J.,
delivered the opinion of the court:
The claimant is a corporation under the laws of the State of Massachusetts, and doing business in the city of Boston.
By the act of March 3, 1883, chapter 96, for testing 12-inch cast-iron breech-loading cannon, a sum of money was appropriated for the manufacture of that class of ordnance. In pursuance of the power given by said act, communication was opened by the proper officer of^the defendants with the claimant for the purpose of having manufactured the kind and description of cannon contemplated by the act.
It is alleged that up to the time of the passage of the statute no such cannon had been manufactured, and the proposition to make such guns of cast iron was as to the claimant and the defendants experimental; that after the correspondence between the parties it was understood and agreed that the *198 experiment should be made, and that the defendants should not be at any more expense than the actual cost of such experiments ; no profit was to be allowed for the use of the claimant’s plant, and claimant was to rely upon future business to recompense it in the manufacture of guns which thereafter might be made for the defendants.
It is alleged that it was understood between the parties that, as the casting was experimental, the defendants were to reimburse the claimant for any outlay which it might be subjected to in the experiment; that with such understanding claimant put its plant in order for the work comtemplated; thereafter a contract was submitted to claimant by defendants; such contract cast upon claimant the risk of the experiment, whereupon it refused to sign the agreement upon the ground that it would rather abandon the expense which it had incurred than to assume the rest of the experiment. After such refusal and further correspondence, to wit, on the 24th of September, 1883, a contract for five guns was submitted, with the explanation that so far as the initial tension was concerned, the defendants would assume the responsibility, and its ordnance officer would be present and regulate the cooling’ process and the casting of the guns; that the cooling process, in pursuance of such arrangement, was under the personal direction of an ordnance officer of the defendants.
It is also alleged that in casting the guns the process was under the direction of said officer, and notwithstanding the suggestion of the officers of the claimant against the mode of casting, the officer in charge required that the guns should be cast with the “breech downward,” instead of the “breech upward,” as urged by the officers and agent of claimant.
As to the execution of the contract, the claimant alleges that, relying upon the explanations and inducements of several letters, it entered into the agreement on the 24th of September, as set forth in the fourth finding, with the understanding and agreement that as the casting of the guns was experimental, and at a price affording no profit, said casting was to be made at the sole risk and cost of the defendants.
It is further alleged as to the casting of one of the guns in the contract mentioned, to wit, in July, 1884, that against the judgment and protest of the claimant, it was required to be cast “ breech down,” instead of “ breech up.”
*199 It is farther alleged that by tbe terms of tbe contract tbe defendants were to furnish tbe flasks in which tbe gun was to be molded, and that tbe flasks so furnished were weak and unfit for tbe work, and so deficient that they were unable to sustain tbe weight of metal,- and when the casting was attempted to be made “breech down” the flask gave way and destroyed the casting and rendered the labor and material a total loss.
It is also alleged, as an additional grievance, that in December, 1884, the claimant further attempted to cast the gun under the direction of an ordnance officer of the defendants, whose duty it was to regulate the flow of water during the casting, so as to control tbe initial tension. That for such purpose he was in charge; the gun was cast “breech down,” not in accordance with the recommendation of your petitioner; that during the casting the ordnance officer failed to control the cooling process properly, but permitted the metal to chill or in some other manner to fail to adhere to the previous layers, and so produced cracks and crevices which rendered the gun valueless ; that the gun was placed in the lathe and developed cracks and crevices originating from the failure of the officer of the defendants to properly regulate the flow of water in the cooling process, and in consequences thereof the same was worthless.
Itis alleged that cost and expense of the unsuccessful attempts in July and December was the sum of $35,000, which was laid out and expended by claimant.
The twenty-second clause of the petition asks a reformation of the contract, so as to conform with the alleged agreement of the parties in casting the cost of the experimental work upon the United States.
These are the substantial allegations of the claimant’s cause of action, and from them it is to be deduced that a recovery is sought for the unsuccessful casting of the guns because of the general liability of the defendants to bear the expense of the experiment, and the further liability based on the improper interference and incompetent discharge of duty of the ordnance officer of the defendant in charge of tbe experimental casting, and the insufficiency of the flasks furnished by the defendants under the contract.
It is insisted by claimant that by the terms of the agreement as construed in the light of tbe antecedent correspondence, the *200 cost of an unsuccessful experiment was to be borne by tbe defendants, and that the contract is to be reformed in effect to that extent. The provisions of the contract affected by this contention relate to the casting of the “ 12-inch breech-loading rifled gun finished in readiness for the insertion of a wire wrapped steel tube and breech-bushing shall be made breech down ” specified as the fourth in the series of the contract.
It is insisted, in connection with the terms of the agreement, that as to that gun there shall be inserted as a part of the agreement in effect the words “at the risk of the United States.”
The findings show that as to that gun there were two unsuccessful efforts made, one in July, 1884, and the other in December, 1884, and for the cost of those two failures' this action is prosecuted.
Since the passage of the act of March 3, 1887 (24 Stat. L., 505), tiiis court has been clothed with equity power sufficient to deal with the question of the reformation of a contract, so as to effectuate the full intention of the parties, and the only question for us to determine in that connection is, was there a mutual mistake made in the reduction of the agreement to the terms employed in the exemplification of the written instrument?
The contract was executed by the Chief of Ordnance of the United States and the president of the company, between whom, as appears in the findings, the most, if not all the negotiations were conducted antecedent to the making of the written instrument. The testimony of the Chief of Ordnance was not taken, owing to his sickness and death, and it does not appear from the testimony of the president of the company that he signed the contract in the belief that it embodied in terms that the experiment as to the casting of the gun was to be at the risk of the defendants. The most that can be said in favor of the company is, that the president at the time he executed the agreement believed that the correspondence between him and the ordnance officer in the particular of the risk at cost of the United States would form a part of the agreement and measure the rights of the parties.
Upon the question of the reformation of the agreement, so that the same shall read “at the risk of the United States,” it is shown in the last paragraph of finding m that the contract *201 was prepared by tbe Chief of Ordnance in the city of Washington and sent to the claimant to be executed, and was by the president duly considered. He carefully read the same, consulted with his associates in interest as to the terms of the agreement, and after careful examination signed it, as set forth in the finding. The only qualification affecting the action of the company might have been the belief on the part of the president at the time he signed the agreement that the terms of the agreement would be modified by the force and effect of the explanatory correspondence between the parties antecedent to the execution of the instrument.
It is insisted by the claimant that it is competent and proper for the court to construe the terms of the written agreement in the light and by the force of those letters. To sustain this theory the claimant’s counsel cites thé case of Equitable Insurance Company v. Hearne (20 Wall., 494). In that case the con-trovery grew out of a discrepancy between the agreement of the parties as it was understood by them in certain correspondence and the policy of insurance when it was delivered to the insured, and in that connection the court says: “ He had a right to assume that the policy would accurately conform to the agreement thus made, and to rest confidently in that belief. It is not probable that he scanned the policy with the same vigilance as the letters of the company. They tended to prevent such scrutiny, and, if it were necessary, threw him off his guard.”
In the case of Hearne v. Marine Insurance Company (20 Wall., 490) it is said by the Supreme Court, upon the question of the reformation of a contract: “The reformation of written contracts for fraud or mistake is an ordinary head of equity jurisdiction. The rules which govern the exercise of this power are founded in good sense, and are well settled. Where the agreement as reduced to writing omits or contains terms or stipulations contrary to the common intention of the parties, the instrument will be corrected so as to make it conform to the real intent. The parties will be placed as they would have stood if the mistake had not occurred.” It is not necessary to cite at length other authorities on this point, as the apt words of the court in the above case succinctly state the law on that branch of this controversy. The mistake must be mutual and common to both parties to the instrument, and must be such *202 as to have no reasonable doubt as to the existence of a common mistake. The contract in issue was prepared by the chief of ordnance, and it is to be presumed that he knew exactly vvliat its provisions were and was deliberately signed after full consultation and investigation by the president of the company.
In the case of Garfield, cited by claimant (93 U. S., 242), the United States invited proposals to perform certain mail service upon which the claimant made a bid, which was accepted by the United States, and the court held that the acceptance by the Post-Ofiice Department of the proposal of a bidder to so carry the mails had the same force and effect as if a formal agreement had been written and signed by the parties. And also in the case of Harvey v. The United States (105 U. S. It., 071) the court held that the advertisement inviting proposals, and the written bid of the claimant, accepted by the proper officer of the United States, but left out of the agreement by accident or mistake, was proper to be considered by the court in determining the rights of the parties, and the contract was reformed to the extent of making such advertisement a part of the agreement. The controversy in the case at bar does not originate from the advertisement for proposals, and the bid of the claimant on such proposal and the acceptance of the same by the United States, but originates from correspondence between the parties prior to the execution of the agreement as to what the parties should agree to and adopt as the final terms of the contract.
In this connection the court determines that the finding is not sufficient to reform and change the terms of the contract so as to cast upon the defendants the risk and liability for the expense and loss of material incident to the two unsuccessful experiments in July and December, 1864. Nerius v. Dunlap, 33 N. Y. Court of Appeals, 676; StocJcbridge Iron Company v. Hudson Iron Company, 102 Mass., 45; National Fire Insurance Company v. Crane, 16 Md., 260; Palmer v. Coni'erse, 60 Ill., 260; Palmer v. The Hartford Fire Insurance Co., 54 Conn., 489; Gray y. Woods, 4 Blackford (Ind.), 432.
This view of the case upon the question of reformation remits the consideration of the court to the contention that the correspondence is a part of the agreement, and that such correspondence shows that the fabrication of the guns was one of experiment, and that the cost of an unsuccessful molding was *203 to be borne by the defendants. We do not consider that tbe facts of this case bring the correspondence antecedent to the execution of the contract on the 24th of September within the rule announced by the Supreme Court in the Hearne Case (siipra). This case differs from that in the fact that both parties signed the agreement after a preparation of it by one party and a most careful examination and consideration upon the part of the other party.
In the insurance case the contract was signed by only one of the partners, and, as the Supreme Court says, “ It is not probable that he scanned the policy with the same vigilance as the letters of the company.”
But conceding the consideration of the letters as proper in connection with the terms of the contract finally put into form on the 24th of September, do they establish the contention of the company that the casting was merely experimental and that the costs and expense was to be at the risk of the defendants'?
The contract provides that “these gun bodies and the gun shall be delivered by the party of the first part completed as required by the contract. * * * For these gun bodies there shall be paid by the United States to the said party of the first part, subject to the conditions stipulated above, on delivery in good condition at their works.” The contract also provides that the gun as to which both failures were made was to be cast “ breech down,” and it will be seen by the letter of the company that it only insisted for a casting “ breech up” as a progressive experiment, and that such a mode of casting would be as safe as the old method of “ breech down.” The theory of the claimant is that the defendants in the final correspondence agreed that the casting should be at the cost of the defendants. We do not so construe that correspondence.
In the letter of the 17th of August, 1882, the Chief of Ordnance says: “The whole question of risk was amply provided for in the very liberal profits allowed in the sums stipulated to be paid under the contract.” And in the same letter he quotes from the testimony of Mr. Hunt before, a committee, in order to show that the company had the utmost confidence in its ability to make a successful fabrication of the character of guns provided for in the agreement, while in the later letters of the president of the company he insisted that the risk should *204 be on the United States. The agent of the United States did not agree or consent to that change in what he regarded as the obligation and undertaking of the company. There was some modification of the first agreement sent to claimant as to tension, but that it was changed so as to place the responsibility on the defendants does not appear from, the letters of the Chief of Ordnance.
This view of the case disposes of the claims for the failure of July, 1884, and that of December, 1884, on the general liability of risk for unsuccessful experiments being at the cost of the defendants.
The December failure grew out of a defect in the casting when subjected to the process of reduction on the lathe. The failure was not due to any interference upon the part of the agent of the United States. The claimants attempted to cool the gun in accordance with the plan provided in the agreement, and without any fault upon the part of defendants in the process of casting it was unsuccessful.
In the seventh finding it was shown that by an agreement made at the time when the parties were negotiating as to the contract for the fabrication of the guns, the defendants being-in possession and owners of certain flasks, it was agreed that in the process of casting the defendants were to furnish to claimants such flasks, and in consideration of which a compensation was allowed the defendants in the price agreed to be paid for the work. In pursuance of that agreement the claimants used the flasks of the defendants in making the castings in July, 1884; but in the process of molding the flasks furnished by the defendants were unable to sustain the weight of molten iron, and because of such weakness gave way, and in consequence thereof the casting became a total loss.
Such failure is one of the grievances complained of in the petition of claimants, and the question arises which of the parties is to bear the loss of such failure. The legal theory on which this claim is based is, that the defendants having furnished the flasks there is an implied warranty on the part of the defendants that they were sufficient to perform the service for which they were intended, and having failed in such sufficiency, there is a violation of the warranty; and the conse-' quence of such failure must fall on the defendants. The claimant had a right to use the flasks contributed by the de *205 fendants, and was compelled to do so unless it assumed tbe burden in violation of its own interest to furnish flasks of its own. It may be said that in strict compliance with its obligation under the contract with the defendants it was the duty of claimants to use the flasks. Although we hold that the casting was at the risk of the claimánts, it does not follow that a failure growing out of the insufficiency of the flasks cast the responsibility of the loss on the claimants. The defendants having been paid for the use of the flasks, in calculating and determining the compensation of the claimants for the work, they assumed the responsibility that the flasks would prove sufficient in the process of molding. The finding shows that because of their weakness they failed to do and perform what was expected by both parties. The failure in July, 1884, was not in consequence of any omission or fault of claimant, but the fault of the defendants in not furnishing flasks of sufficient capacity to sustain the weight and force of the iron.
- This case having in some particulars the nature of a proceeding in equity, and at the request of the parties, we have set out in extenso letters and other documents which might not be necessary in an ordinary suit, in order that in case of appeal the entire controversy may appear; and we determine from the whole record that the claimant is entitled to recover the sum of $20,828.33, as set out in finding vm, but not entitled to recover the item of $16,814; and for said sum of $20,828.33 a judgment is ordered.