## TEXAS STAR FLOUR MILLS CO. v. MOORE et al.

(Circuit Court, W. D. Missouri, W. D. March 21, 1910.)

1. SALES (§ 168*)—QUALITY—INSPECTION—BOARD OF TRADE REGULATIONS.

   Where plaintiff and defendant were well acquainted with the regulations of the Kansas City Board of Trade concerning the inspection of grain, and especially one providing that a certificate of quality by an inspector appointed by the board was evidence between buyer and seller of the quality of the article sold and should be binding between the members of the board and others interested or requiring or assenting to the employment of such inspectors, etc., plaintiff having purchased sample wheat from defendant in Kansas City subject to the rules of the board and to the inspection there of H., a Board of Trade inspector, plaintiff, in the absence of fraud, was concluded by the certificate of H. that the grain shipped was in accordance with the sample.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 403–408; Dec. Dig. § 168.*]

2. SALES (§ 168*)—INSPECTION—PLACE.

   A contract for the sale of wheat f. o. b. Kansas City meant that the wheat should be inspected there.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 403–408; Dec. Dig. § 168.*]

3. SALES (§ 437*)—WARRANTY—PLEADING.

   Plaintiff, having declared on an express warranty, cannot recover on an implied one.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. § 1251; Dec. Dig. § 437.*]

4. EVIDENCE (§ 441*)—PAROL EVIDENCE—SALES—ANTECEDENT NEGOTIATIONS.

   An antecedent representation of the quality of an article offered for sale, which the prospective buyer declined to accept, cannot be carried forward and attached to a subsequent convention relating to a sale of the same commodity, evidenced in writing. which did not mention the former assurance as an integral part of the agreement.

   [Ed. Note.—For other cases, see Evidence, Dec. Dig. § 441;* Sales, Cent. Dig. § 721.]

5. SALES (§ 261*)—PUFFING.

   A representation that a commodity offered for sale was "good wheat" did not impart a warranty, and was mere puffing.

   [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 727–735; Dec. Dig. § 261.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

At Law. Action by the Texas Star Flour Mills Company against Benjamin C. Moore and others. Judgment for defendants.

This is an action at law to recover damages for an alleged breach of contract. By stipulation of parties, trial by jury was waived, and the case was submitted to the court on the pleadings and proof. The court makes the following

### Finding of Facts.

(1) The contract is evidenced by written correspondence between the parties in the form of letters and telegrams respecting the sale of wheat by the defendants to the plaintiff. The plaintiff was at the times in question the owner and operator of a flour mill at Galveston, Tex. The defendants were grain merchants, operating on the Board of Trade at Kansas City, Mo.

(2) On the 3d day of February, 1908, the defendants, doing business under the name of "Moore Grain Company," sent the plaintiff the following telegram:

"Offer ten thousand bushels No. 2 red winter wheat 96½ fob Kansas city within ten days answer by telegraph immediately."

The plaintiff did not make answer by telegram as requested but on the 4th day of February, 1908, sent to the defendants by mail the following letter:

"Your message quoting soft wheat received, but sorry we are unable to trade with you. Do not anticipate placing further orders in Kansas City for the present."

On the 3d day of February, 1908, the same day on which the defendants sent the telegram above quoted, they wrote the plaintiff the following letter:

"Your valued favors of the 31st ult. and first before us and contents carefully noted. Whenever you thing the market has had enough decline and you are in the notion of buying, will be glad to have you wire us and we will name you lowest price possible to name on 2 red and 2 hard wheat. You know the quality of our red wheat, as we shipped you twenty or thirty thousand bushels of it and the wheat we have on hand is the same quality of wheat and we know it will please you."

The said letter of February 4, 1908, presumably not having then reached the defendants, on the 5th day of February, 1908, they again telegraphed the plaintiff as follows:

"Offer ten thousand bushels No. 2 red winter wheat 97½ within ten days answer by telegraph immediately."

On the 5th day of February, 1908, the plaintiff wrote the defendants the following letter:

"We have your message quoting soft wheat again today, but as previously advised it is not necessary for you to wire us these quotations unless we request them, as we are not buying anything from your market in soft wheat now. We are of course always glad to hear from you, but telegrams are an unnecessary expense. Will be pleased to have you write us conditions frequently."

On the 6th day of February, 1908, and prior to the receipt of the letter last above named, the defendants wrote the plaintiff the following letter:

"Answering your valued favor of the 4th, will state that, whenever you are in the market for any red wheat, will be glad to have you take the matter up with us by wire and we will endeavor to trade with you. As we stated to you in previous letter, this red wheat that we are offering is just exactly like the 20,000 bu. we shipped you in November and such as we can guarantee for sound wheat."

The foregoing correspondence pertained to No. 2 wheat and resulted in no contract between the parties.

(3) After the foregoing, and on the 18th day of February, 1908, the plaintiff sent the defendants the following telegram:

"Express sample and make price ten thousand bushels No. 2 red winter wheat basis Chicago May."

On the same day the defendants sent to the plaintiff the following telegram:

"Offer sample red wheat 1½ over Chicago May fob Kansas City our weights

and inspection within ten days shipment subject to your immediate reply by telegraph. This is good wheat."

To this last telegram the plaintiff replied on the same date as follows:

"Telegram received. Book ten thousand No. 2 red winter wheat at today's closing."

On the same day the defendants sent the plaintiff the following telegram: "Have booked you ten thousand bushels sample red 93¼ Kansas City. What routing do you wish?"

On the same day plaintiff telegraphed the defendants as follows:

"Ship Chicago, Rock Island & Pacific care H. & T. C. if possible. Bill export. Otherwise route your option."

(4) On the 19th day of February, 1908, the defendants telegraphed plaintiff as follows:

"Just have fifteen thousand bushels more sample red left. Will book it to you at 1½ over Chicago May, fob Kansas City within ten days subject Hiddleston's approval. Answer by telegraph immediately."

To which the plaintiff on the same day replied by telegraph as follows:

"Accept offer fifteen thousand bushels basis today's closing subject Hiddleston's approval."

Whereupon on the same day the defendants telegraphed the plaintiff as follows:

"Have booked you ten thousand bushels sample red wheat 93¾ fob Kansas City subject Hiddleston's approval. Had sold other five thousand bushels before receiving your wire."

On February 18, 1908, the plaintiff sent the defendants the following letter by mail:

"Exchange of wires date resulted in our purchase of you ten thousand bushels sample red wheat 93¼ cents fob Kansas City, ten days' shipment. We have further wired you to ship swooned care H&TC if possible; bill export, 'otherwise route your option,' which we confirm. Trust you will make a point of loading us out a very nice line of stuff and have particular care used in the matter of coopering the cars, so that the weights will hold out fully here. Trust you have complied with our telegraphic request regarding the sample. Awaiting your shipping documents, we beg to remain."

On the day last aforesaid, the defendants mailed the plaintiff the following letter:

"We have a wire from you this morning saying, express samples and make price 10,000 2 red wheat basis Chicago May. We immediately wired you, sample red wheat 1½ cents over Chicago May fob Kansas City, our weight and grades, ten days shipment, subject to your immediate reply. We also stated that this was good wheat. We later had a wire from you stating that our telegram had been received and to book 10,000 2 red wheat at today's close. Chicago May today closed at 91¾ cents; our sale to you was 1½ over Chicago May, which was 93¼ cents Kansas City. We herewith enclose confirmation covering sale. Kindly sign duplicate and return to us. We are expressing you tonight a large sized sample of this red wheat. You of course, understand that we are not selling this as 2 red wheat but are selling it like sample and guarantee it to be fully equal to same. We have ordered Kansas City Southern empties for this loading and trust that same is satisfactory."

On the 19th day of February, 1908, the defendants wrote the following letter:

"In answer to our inquiry yesterday asking what routing you desired on the 10,000 wheat, we had your reply saying ship Rock Island care H. & T. C. if it was possible to do so, and to bill for export; otherwise route our option. When the writer sent you this wire he did not know the elevator had already put in orders for Kansas City Southern empties to use on contract, so when we received your wire saying we could use our own routing if Rock Island was not convenient, we decided to let the order stand with the Kansas City Southern, and let the 10,000 wheat go via that route, which we trust will meet with your approval. We can get the cars much quicker via Kansas City Southern and their time is much better than the Rock Island. We turned over to J. J. Hiddleston, Board of Trade Sampler, a good sized sample of red wheat and will have him approve of each car before shipment. We wired

you today that we had just 15,000 bushels more of this sample red wheat left, and that we would book it to you at 1½ cents over Chicago May fob Kansas City, ten days shipment, subject to Hiddleston's approval, but we have heard nothing from you. Since wiring you we have sold 5,000 bushels of this wheat, so that we only have 10,000 bushels of this red wheat on hand. This cleans us up and if you are in the market for any more of this wheat, we will be glad to sell you the 10,000 bushels and clean it up. How about some hard wheat? We have a sample hard wheat that we call sample 'B' wheat, testing 60 pounds, which is giving excellent satisfaction throughout Texas. We are mailing you under separate cover tonight, a sample of this wheat, and our ideas on this wheat are 1½ cents over Kansas City May fob cars Kansas City. Basis tonight's market, this would be 90½ cents Kansas City for sample 'B' wheat."

On February 20, 1908, the defendants wrote to the plaintiff the following letter:

"In answer to our quotation yesterday stating that we had just 15,000 bushels of red wheat left unsold and offering it to you a cent and a half over Chicago May fob cars Kansas City, we had your reply yesterday afternoon booking the 15,000 bus. basis close of the market last night, subject to Hiddleston's approval. Not hearing from you promptly, we had disposed of 5,000 bus. of this sample red wheat, so when we received your wire last night booking 15,000 bus. we immediately wired you as follows: 'Have booked you 10,000 bus. sample red wheat 93¾ fob cars Kansas City, subject Hiddleston's approval. Had sold other 5,000 bus. before receipt your wire.' We enclose herewith confirmation covering 10,000 bushels, duplicate of which kindly sign and return to us. Sorry we could not book your full order, but we are afraid to sell any more now until we fill all of our orders for this red wheat. We might have four or five thousand bushels left, but as stated before, we prefer to load all our orders and then if we have any left, will give you the first show at it."

On the same day last aforesaid, the defendants wrote the plaintiff the following letter:

"Your valued favor of the 18th at hand confirming 10,000 bushels wheat sold you on that date. We wrote you last night that we were going to let this wheat go to you in Kansas City Southern cars. So long as it is to be billed for export we presume the route makes no difference to you, and as the Kansas City Southern we believe will make much quicker time than any other line, we are going to let it go that way. Now in regard to coopering the cars; we will be very careful. We have instructed our elevator foreman to line each one of the cars with cloth so that there will be absolutely no chance for leakage, and our weights should hold out, practically no shortage at all."

On February 21, 1908, the plaintiff wrote the defendants the following letter:

"We have your two favors of 18th and 19th and beg to return herewith confirmation duly signed on the first ten thousand bushels of soft wheat at 93¼ fob Kansas City. Please bear in mind that we want this wheat routed in care of the T & N O at Beaumont when billed out of Kansas City on the KCS, and as previously advised, if it comes via Rock Island, we want it billed in care of H & T C at Fort Worth."

February 22, 1908, the plaintiff wrote the defendants the following letter:

"We are in receipt of your favors of 20th inst. and have noticed same carefully. Beg to return herewith copy of confirmation on the last ten thousand bushels duly signed, and call your attention to the fact that it reads 93¼ fob Kansas City, the purchase price, however, being for 93¾ fob Kansas City. We confirmed in our previous letter at the right price of 93¾."

On February 24, 1908, the defendants wrote the plaintiff the following letter:

"In answer to your valued favor of the 20, will state that as you requested, all of our shipments to you will go care of Kansas City Southern care T & N O at Beaumont. However, there will be one 80,000 pound car which will arrive in Galveston over the G & I S, as we only loaded 60,000 pounds in this car and to avoid being charged this extra 20,000 pounds, it is necessary to ship it as above stated."

On March 5, 1908, the defendants wrote the plaintiff the following letter: "We had your wire of even date before us this morning and note that five cars of the wheat has arrived and that you are complaining of the quality. The writer has been out of town the greater part of the last ten days, account of sickness and did not see all the wheat when loaded, but upon looking up our records, find that Mr. J. J. Hiddleston, Board of Trade Sampler, sampled each and every car of the grain shipped to you, and issued a certificate that the grain was up to sample. We asked Mr. Hiddleston to investigate the matter at once and to advise us and we will then take the matter up with you further."

On April 9, 1908, the defendants sent the plaintiff the following letter: "Your valued favor of the 6th at hand and contents carefully noted. The mill has before them all the papers covering this trade and we know that we have filled our contract to the letter and knowing this, insist that our responsibility in the matter has ceased."

On March 12, 1908, the defendants sent the plaintiff the following letter: "Your various favors of the 9th received and contents carefully noted. As we have written you and wired you, this wheat was sold by sample subject to Mr. J. J. Hiddleston's approval here at Kansas City. Mr. Hiddleston examined the wheat when loaded and approved it as being up to sample, therefore we have filled our contract and you must not expect us to do anything further in the matter."

(5) On February 18, 1908, the defendants sent by mail to plaintiff the following confirmation of the first 10,000 bushels of wheat shipped:

"Moore Grain Company. 508 Board of Trade, Kansas City, Mo.     Members
                        Kansas City Board of Trade.

                           "Confirmation.

"This contract is subject to the Rules and Regulations of the Kansas City Board of Trade.

"We hereby confirm sale to you today by wire of 10000 bu sample red wheat at 93¼ fob cars Kansas City.

"Subject to KC inspection and KC weights. Shipment within 10 days.
Our routing...........................................................
...............Awaiting instructions...................................
Care ................................................................
...............Wheat ................................................
...............Subject approval J. J. Hiddleston.
  "Terms:—Demand draft with Bill of lading attached, payable on presentation."

On the 20th day of February, 1908, the defendants sent the plaintiff the following confirmation of sale:

"Moore Grain Company, 508 Board of Trade, Kansas City, Mo.     Members
                        Kansas City Board of Trade.

                           "Confirmation.

"This Contract is Subject to the Rules and Regulations of the Kansas City Board of Trade.

"We hereby confirm sale to you today by wire of 10000 bu sample red wheat at 93¼ fob cars Kansas City.

"Subject to K. C. inspection and K. C. weights. Shipment within 10 days.
"Subject Hiddleston's inspection.

"Terms: Demand draft with Bill of Lading attached, payable on presentation."

Both of the foregoing confirmations were received by the plaintiff in due course of mail, and by it signed as follows: "Texas Star Flour Mills, W. A. Barlow."

(6) The plaintiff honored and promptly paid the bills sent on said shipments.

Among the published rules of the Board of Trade of Kansas City, in question, section 4, is the following:

'Sec. 4. It shall be the duty of the board of directors when deemed necessary to fix and establish standards of grades or qualities for flour, grain, provisions and hay, and, as occasion may require, any other articles or commodities dealt in by members of this association and the certificate of any inspector, weigher, gauger, or measurer, appointed by the said board, as to the quality or quantity of any such article, or his brand or mark upon it or upon any package containing such article, shall be evidence between buyer and seller of the quality, grade or quantity of the same, and shall be binding upon the members of this association, and others interested or requiring or assenting to the employment of such inspectors, weighers, gaugers, or measurers."

The plaintiff was, at the time of the transaction in question, familiar with said rule of the Board of Trade.

(7) Samples of the wheat in question were furnished by the defendants to Mr. Hiddleston, official inspector of the said Board of Trade of Kansas City, taken in the usual, customary manner, from which the said Hiddleston was to make the inspection of the wheat in question. Prior to the shipments of the grain said inspection was duly made according to the usual, customary method pursued on said Board of Trade; said inspector made and furnished his official certificate showing that 'said wheat so inspected by him corresponded with the said sample. The sample was designated in the certificate as "sample No. 5," which was the mark placed thereon by Mr. Moore and left with Mr. Hiddleston. The defendants forwarded these certificates to the plaintiff, and drew on it for the wheat, attaching bills of lading to the drafts. Upon receipt of said certificates, the plaintiff paid the drafts, and took up the bills of lading without waiting for the arrival of the wheat, and without claiming the right to further inspection.

A sample of the wheat from which said Hiddleston made said inspection was forwarded by the defendants to the plaintiff. It was what is known as a "mail sample," and not an express sample. The sample sent was not a large sample; the smaller sample being sent by the defendants for the reason that they were not able to furnish larger sample. The plaintiff made no objection at the time, to the defendants, to the sample sent.

(8) The shipments were made at Kansas City, Mo., f. o. b. to the plaintiff at Galveston, and routed according to directions. On receipt of the shipments the plaintiff had an inspection made of the wheat by its inspector at Galveston, who saw the sample held by the plaintiff, but it does not appear affirmatively from the evidence that the inspector had before him the same at the time of his inspection.

(9) The wheat sent by the defendants to the plaintiff was partially binburnt, weevil-cut, and musty. It was, however, such as could be milled successfully, especially when mixed with a small per cent. of hard wheat. The defendants did sell such wheat of the bin in question at Kansas City for milling purposes at said time. The wheat was not all binburnt, or weevil-cut, or musty. Weevil cutting tends to make the grain lighter. The grain in question weighed 59 pounds to the bushel, one pound more than No. 2 wheat is required to weigh.

(10) The said wheat so shipped, to wit, 10,000 bushels, was at the price of 93¼, and 10,000 bushels at 93¾ cents per bushel, or an average of 93½ cents per bushel. It was worth that amount in the market where sold, and it was sold to the plaintiff at a price of 3 to 3½ cents per bushel less than the then market price of No. 2 wheat.

(11) The plaintiff sold the wheat at Galveston at 92¾ cents per bushel delivered at the elevator; in addition to which is the charge of loading on vessel of 1½ cents per bushel, which made 94¼ cents per bushel f. o. b. at Galveston. At that date No. 2 wheat at Galveston was worth between 96 and 97 cents per bushel f. o. b. vessel at Galveston.

(12) Kansas City, Mo., at that time, was a grain market for all kinds of wheat, hard and soft, and of all grades. At Galveston the only general market is export of hard wheat. The only purchaser there of soft wheat was the plaintiff company. Soft wheat when sold at Galveston for exportation was mixed in with some hard wheat, and graded as hard, which brought practically the same price as hard wheat.

(13) The amount of the freight charges paid by the plaintiff on said shipments was at the rate of 18½ cents per hundred, which amounted to $2,204.13. The amount paid for switching 15 cars at Galveston at $1.50 per car amounted to $22.50.

### Conclusion of Law.

On the foregoing facts found the court declares the law to be that the plaintiff cannot recover.

It is therefore ordered and adjudged by the court that the plaintiff take nothing by its action, and that the defendants go hence without day with their costs in this behalf had and expended, and that they have execution therefor.

[Signed] Jno. F. Philips, Judge.

Stewart Taylor, for plaintiff in error.
E. R. Morrison, for defendants in error.

PHILIPS, District Judge (after stating the facts as above). As the dealings between the parties, resulting in the contract of sale of the wheat in question, is evidenced by telegrams and letters between them, they must determine what the contract was.

The first correspondence, beginning on the 3d day of February, 1908, pertained to No. 2 wheat, and resulted in no contract, for on the 4th day of February, 1908, the plaintiff wrote the defendants saying:

"Your message quoting soft wheat received, but sorry we are unable to trade with you. Do not anticipate placing further orders in Kansas City for the present."

On the 5th day of the month, and evidently before the letter above quoted was received, the defendants telegraphed the plaintiff:

"Offer 10,000 bushels No. 2 red winter wheat 97½ within 10 days. Answer by telegraph immediately."

The plaintiff did not answer by telegraph, but on that date wrote to the defendants saying:

"As previously advised it is not necessary for you to wire us these quotations unless we request them, as we are not buying anything from your market in soft wheat now. We are of course always glad to hear from you, but telegrams are an unnecessary expense. Will be pleased to have you write us conditions frequently."

Evidently before the receipt of the last above letter, the defendants wrote the plaintiff, in answer to its letter of February 4, 1908, saying, in substance, that, whenever the plaintiff was in the market for any red wheat, they would be pleased to take up the matter by wire and then would endeavor to trade. It was in this letter the defendants stated the red wheat, then offered, was like the 20,000 bushels shipped in November previously. As there was no response to this by plaintiff, the defendants' proposal was at an end. Thus matters stood until the 18th day of February, 1908, when the defendants sent to the plaintiff a telegram offering sample red wheat at 1½ cents over Chicago May f. o. b. Kansas City. "Our weights and inspection within 10 days. Shipment subject to your immediate reply by telegraph." To which, on that day, the plaintiff replied by telegram, directing to express sample and make price 10,000 bushels No. 2 winter wheat. From

which it is manifest that the proposals made by the defendants embraced two distinct features: (1) That it was on defendants' weight and inspection. (2) That it was subject to the plaintiff's immediate reply by telegram. The reply sent was to express sample and make price 10,000 bushels No. 2 red wheat. The defendants did not accept such counter proposition to ship No. 2 red wheat. But their proposal was a sale to be made by sample; and, as no price was fixed, the contract was yet incomplete. Thereafter the defendants answered: "We booked you 10,000 bushels sample red wheat 93¼ Kansas City"—enquiring as to what routing the plaintiff wished.

Thus the purchaser was again advised that what the defendants were offering and selling was sample red wheat at the price of 93¼ at Kansas City f. o. b. The answer made to this by the plaintiff was simply a direction as to the routing of the cars.

The additional 10,000 bushels of wheat was sold on telegram of February 19, 1908, which offer the plaintiff then accepted. As the defendants had sold 5,000 bushels of the 15,000 bushels offered, they shipped only 10,000 bushels, which the plaintiff accepted.

The only difference, therefore, in the two transactions of the 18th and 19th days of February, is that the first shipment was "on our inspection," and the second named Hiddleston as the inspector. Both sales were by sample and on inspection on Kansas City Board of Trade. While the sample sent was not a large express sample as requested by the plaintiff, the sample sent was received by the plaintiff without objection made at the time to the smaller quantity; and the inspection was made as proposed at Kansas City. The official certificate thereof was made by the duly constituted and recognized inspector at Kansas City according to the rules and regulations of the Board of Trade, with which the plaintiff, as a dealer, was familiar. Confirmations of these sales were duly forwarded by the defendants; the first on the 18th day of February, 1908, reciting on its face that "this contract is subject to the rules and regulations of the Kansas City Board of Trade," and further stating on its face, "Subject approval J. J. Hiddleston." The other sent on the 20th day of February, 1908, contained the same recitations on its face. These confirmations were accepted by the plaintiff on receipt, and returned to the defendants without objection.

These confirmations with the acknowledgement thereof were a clear recognition by the plaintiff: (1) That the transaction was subject to the rules and regulations of the Kansas City Board of Trade: and (2) that it was subject to Hiddleston's inspection. If the plaintiff did not so understand the telegrams and letters, the time for it to say so was on receipt of the confirmations. No more wholesome rule for the interpretation and application of such contracts between parties is to observe the construction placed thereon by them before any litigation arises between them respecting the same. This rule was expressed as follows in Moore v. Beiseker et al., 147 Fed. 367, 77 C. C. A. 545:

"There has never been any rule of construction of contracts more instinct with the spirit of justice and practical sense than that which declares that, where the provisions of a contract become the subject of controversy between the parties, the practical interpretation placed thereon by their acts, conduct,

and declarations is of controlling force. This for the reason that the interest of each leads him to a construction most favorable to himself, and, when differences have become serious and beyond amicable adjustment, it is the better arbiter."

So it was said in Long-Bell Lumber Company v. Stump, 86 Fed. 578, 30 C. C. A. 264:

"Courts may use the actual construction put thereon by the conduct of the parties under the contract as a controlling circumstance to determine the construction which should be put upon the contract in enforcing the rights of the parties. The most satisfactory test of ascertaining the true meaning of a contract is by putting ourselves 'in the place of the contracting parties when it was made, and then considering, in view of all the facts and circumstances surrounding them at the time it was made, what the parties intended by the terms of their agreement.' And when this intention is made clear by the course of their subsequent dealing and action thereon, it must prevail in the interpretation of the instrument, regardless of inapt expressions or careless recitations."

See, also, District of Columbia v. Gallaher, 124 U. S. 505, 8 Sup. Ct. 585, 31 L. Ed. 526.

As shown by the testimony of its manager, the plaintiff was quite familiar with the rules of the Kansas City Board of Trade, among which was the following:

"The certificate of any inspector, etc., appointed by the said board as to the quality, etc., of any such article, etc., shall be evidence between buyer and seller of the quality, grade or quantity of the same, and shall be binding upon the members of this association, and others interested or requiring or assenting to the employment of such inspector, etc."

That inspection was made by the sample furnished by the defendants to the inspector, and the part sent by them to the plaintiff.

There is no charge preferred in the petition of any fraud respecting the sample that was sent, or respecting the inspector's certificate. This action is a simple suit at law for breach of contract. The plaintiff would have been required to resort to a suit in equity surcharging the certificate and sample with fraud, to avoid the certificate. The authorities are all one way touching this proposition. Accordingly, Mr. Justice Harlan, in Martinsburg & Potomac R. R. Co. v. March, 114 U. S., loc. cit. 553, 5 Sup. Ct. 1037 (29 L. Ed. 255), said:

"Upon the supposition that the engineer made such a certificate as that provided by the contract, there is no allegation that entitled the plaintiff to go behind it; for there is no averment that the engineer had been guilty of fraud, or had made such gross mistake in his estimates as necessarily implied bad faith, or had failed to exercise an honest judgment in discharging the duty imposed upon him. The first count of the declaration was, therefore, defective for the want of proper averments showing plaintiff's right to sue on the contract," etc.

It would have been utterly unbusiness like and abnormal for the vendee to expect, or for the parties to have intended, that the inspection of the wheat should be committed to the vendee at Galveston. The well-established rule of law is that the contract f. o. b. means a delivery at Kansas City, and that that was the place of inspection. Fraser v. Ross, 1 Pennewill (Del.) 348, 41 Atl. 204; Stafford v. Pooler, 67 Barb. (N. Y.) 143; Armsby v. Blum, 137 Cal. 552, 70 Pac. 669; West-

ern Construction Co. v. Romona, etc., Stone Co., 41 Ind. App. 229, 80 N. E. 856; Brownlee v. Bolton, 44 Mich. 218, 6 N. W. 657.

Counsel for the plaintiff has cited the court to a number of authorities based upon rules of law respecting implied warranties as to soundness and quality of a commodity or article sold. They have no application here, as the plaintiff has declared upon an alleged expressed warranty. On such a declaration no recovery can be had upon a claim of implied warranty. Pemberton v. Dean, 88 Minn. 60, 92 N. W. 478, 60 L. R. A. 331, 97 Am. St. Rep. 503; Duncan v. Fisher, 18 Mo. 404; Irwin v. Chiles, 28 Mo. 578; Harris v. Railroad Co., 37 Mo. 307.

The petition, for instance, counts upon the statement made in the first letter written by the defendants February 3, 1908, "You know the quality of our red wheat," etc. It would be sufficient of this to say that, as the plaintiff expressly declined to enter into any contract based thereon, it ought not now to fall back on that representation. Two weeks intervened thereafter before the defendants renewed by telegram proposals, and the contract was closed upon what supervened, which was not for the sale of No. 2 wheat such as had been sold the fall before, but was by sample, and subject to inspection. It is too absurd for serious consideration for the representatives of the plaintiff company now to put forth the claim that they understood the defendants were selling them the wheat as No. 2 hard, the same as that delivered in the preceding fall, when the evidence shows, without contradiction, that the market price of such wheat at the time was approximately 3 cents per bushel more than the price at which they were offering the wheat in question. As alert millers, running such business at Galveston, they were well advised from the daily market quotations of the current price of such No. 2 hard wheat.

I know of no recognized rule of law by which a statement made respecting the quality of an article offered for sale, where the offeree had declined to accept the proposal, can be carried forward and attached to a subsequent convention between the parties evidenced in writing which does not mention such former assurance as an integral part of the present agreement. The law, I think, is to the contrary. Benjamin on Sales, § 610, succinctly states—

"that antecedent representations made by the vendor as an inducement to the buyer, but not forming part of the contract when concluded, are not warranties."

See, also, 1 Lawson on Rights & Remedies, § 212; Ashcom v. Smith, 2 Pen. & W. (Pa.) 211, 21 Am. Dec. 437; Iron Works v. U. S., 34 Ct. Cl. 174.

But counsel for plaintiff says that in one of the subsequent letters, wherein the defendants were trying to renew negotiations, they used the expression this is "good wheat." Aside from the testimony of witnesses, commission grain dealers on the Board of Trade, that such term has no defined significance in the trade, it is not too much to say that it has no legal force, as it is mere puffing. In Hogins v. Plympton, 11 Pick. (Mass.) 97, the writing adverted to "good fine wine," and "good Hermitage." Of this Chief Justice Shaw said:

"We are of opinion that the writing in question cannot be considered as a warranty that the wine was of any particular description or quality. One objection is that the words are too uncertain and indefinite."

In Holden v. Dakin, 4 Johns. (N. Y.) 421, paint was sold as good paint, which proved to be useless. The court held that it constituted no express warranty, saying:

"Here was no express warranty as to the quality of the paints. All that was proved upon the trial was that the clerk of the vendor sold the paints for good paints and at a fair price; but this was not sufficient to raise a warranty."

Likewise, in House v. Fort, 4 Blackf. (Ind.) 293, in an action for breach of warranty for the soundness of a horse, it was held that the court should have directed the jury:

"That if the defendant at the time of the exchange, on being questioned as to the horse's eyes, said 'they are as good as any horse's eyes in the world,' this does not amount to a warranty."

The rule is well stated in Mason v. Chappell, 15 Grat. (Va.) 572, loc. cit. 583, as follows:

"No affirmation, however strong, will constitute a warranty unless it was so intended. If it is intended as a warranty, the vendor is liable if it turns out to be false, however honest he may be in making it; but, if it is intended as a mere expression of opinion or simple praise and commendation of the article, he is not liable, unless it can be shown that he knew at the time it was untrue. And in that case it is inaccurate to say that he is liable for a breach of his warranty. His liability arises from the fraud which he was guilty of and should be enforced in an action on the case for deceit."

Plaintiff's counsel relies much upon the ruling in Columbian Iron Works v. Douglas, 84 Md. 44, 34 Atl. 1118, 33 L. R. A. 103, 57 Am. St. Rep. 362, which holds that, in a contract for the sale of goods by description, there is an implied condition that the goods shall correspond with the description; and, therefore, the delivery of some other similar article is a substitution and a breach of the contract. In which case, no question of warranty is involved. That was the sale of certain quantity of steel scrap, consisting only of clippings, etc., from the steel plates of cruisers built by the defendant for the United States navy. After the steel scrap was delivered and paid for, it was found that, of the total 159 tons shipped, 89 tons were cruiser steel and 70 tons were not, and the plaintiff was obliged to sell the 70 tons for a much less sum than he paid for it. It was held that plaintiff was entitled to recover the difference between the price paid and the value of the article delivered. It was further held that where there is a sale of goods by description, subject to inspection by the buyer, the description is not subordinated to the inspection, unless the parties both agree to substitute an inspection by the buyer for the description furnished by the seller.

That is not this case. The concrete case here involved is this: The sale was made by sample subject to inspection at Kansas City. The plaintiff so understood it, for it asked that sample be forwarded. It accepted the defendant's offer, and acted thereon, which stated "on our inspection" and "inspection by Hiddleston." It approved the confirmation of the sales sent by the defendants, expressly reciting the

fact respecting such inspection. As applied to such state of facts, the later ruling by the Maryland court in Lawder Co. v. Mackie Grocery Co., 97 Md. 1, 54 Atl. 634, 62 L. R. A. 795, is more in point. This was an action for breach of contract on the sale of shipment of cases of tomatoes. The contract was made in Baltimore, Maryland. "Buyer to give shipping instructions when required by seller. To be delivered as packed during season of 1901, f. o. b. Baltimore." Touching the question raised by the purchaser as to the right to have the articles inspected before acceptance, the court said:

"The mere fact that the buyer has the right to inspect goods before acceptance does not necessarily mean that the inspection is to be made at the residence or place of business of the buyer. He might inspect at the seller's place of business; but, if the contract provides for the delivery at a particular place, he must accept or reject at that place, unless otherwise provided for in the contract. In short, a contract to deliver at one place cannot be made to mean delivery at another place, because the buyer lives there and has a right to inspect the goods, and there is no uncertainty as to the place of delivery in this contract as would justify the court in holding that it was at New Orleans, because the appellee had its place of business there."

Further on the court said:

"If they determine that by their contract it must control, and if it is silent as to inspection, but it is as clear as this is as to delivery, any inspection that is desired pro tem must be made before or at the time of delivery, when the terms are cash."

In short, it was held that the words "f. o. b." indicated that the seller was to deliver the goods at Baltimore, free on board, to the carrier. The goods went thenceforth at the risk of the buyer, and, even without any specification as to the place of inspection, the implication of law is that it was to be Baltimore, the place of the shipment. In the case at bar, it is manifest from the correspondence that Kansas City was the place of delivery, and the inspection was to be made there, and by a designated person, to determine whether or not the wheat corresponded with the sample. His certificate was to be the evidence of that fact, and, until set aside for fraud, it is conclusive. Cook v. Foley, 152 Fed. 41, 81 C. C. A. 237; Wood v. Railway, 39 Fed. 52. And, in addition to this, the defendants were not selling wheat on a written description, but by sample. In their letter of February 18, 1908, to the plaintiff, they expressly stated:

"You of course, understand that we are not selling this as 2 red wheat, but are selling it like sample and guarantee it to be fully equal to same."

That was before the wheat was received by the plaintiff, and it received it with knowledge of that statement by the defendants. By its silence—making no protest—it acquiesced in and recognized that that was the contract the defendants were acting under.

In the absence of any charge of fraud upon the part of the defendants in not having submitted the proper sample to the inspector at Kansas City, and in the absence of any charge that the sample sent by the defendants to the plaintiff did not correspond with the sample submitted to the inspector at Kansas City, I must rule that the plaintiff cannot recover.