UNITED STATES *v.* WILLIAM CRAMP & SONS SHIP &
ENGINE BUILDING COMPANY.

WILLIAM CRAMP & SONS SHIP & ENGINE BUILDING
COMPANY, APPELLANT, *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS.

Nos. 263, 264. Argued April 18, 19, 1907.—Decided May 13, 1907.

In a contract made between a building company and the United States for
the construction of a battleship at a cost of over three millions of dollars
it was provided that a special reserve of sixty thousand dollars should
be held until the vessel had been finally tried and then paid to the com-
pany "on the execution of a final release to the United States in such
form as shall be approved by the Secretary of the Navy, of all claims of
any kind or description under or by virtue of said contract." The vessel
having been built and the final trial had, all moneys were paid on the
execution by the company of a stipulation to "remise, release and forever
discharge the United States of and from all and all manner of debts, dues,
sums and sums of money, accounts, reckonings, claims and demands what-
soever, in law or in equity, for or by reason of or on account of the con-
struction of said vessel under the contract aforesaid." *Held,* that:
In the absence of anything to the contrary, it will be assumed that the re-
lease which was executed was the one stipulated for in the original con-

tract and was intended to include all matters which according to its terms were to be released by the company as a condition of final payment.

The words in the release "by reason of" are equivalent to those in the original contract "by virtue of" and include all claims which grew out of the performance of the contract, although not arising from the actual construction of the vessel.

41 C. Cl. 164, reversed.

ON November 19, 1890, the William Cramp & Sons Ship & Engine Building Company entered into a contract with the United States to construct what was called "Coast-line battleship No. 1," but afterwards known as the battleship "Indiana," for the sum of $3,020,000, the ship to be completed and ready for delivery to the United States within three years from the date of the contract. As a matter of fact the vessel was not completed and delivered until November 19, 1895, but as the delay was occasioned by the United States no damages were recoverable from the building company on account thereof. On August 10, 1897, the company commenced this action in the Court of Claims to recover the sum of $480,231.90. The elements of its claim are thus stated in its petition:

| | |
|---|---:|
| For time of organization and plant lost in waiting for armor, materials, etc., to be furnished by United States | $144,379.50 |
| For special wharfage, 730 days, at 1 cent per ton per day | 74,825.00 |
| For general care and maintenance of vessel, including coal, firemen, engineers, watchman, canvas awnings, wooden covers, keeping clean, removing snow, dust, etc., extra painting, tug hire, moving derrick, etc., 730 days, at $135 per day | 98,550.00 |
| Additional cost of insurance | 34,462.55 |
| Interest on money borrowed caused by delays of United States which prolonged final settlement | 60,499.91 |
| Extra trial trip made necessary by construction and completion of vessel being delayed by United States | 17,514.94 |
| For loss due to running the official trial of "Indiana" with a foul bottom, as owing to the delay caused in the completion of the vessel it was impossible to clean and paint the bottom | 50,000.00 |
| Total | $480,231.90 |

On May 10, 1894, as appears from the findings made by the Court of Claims, an agreement was made between the parties

by which moneys not then due by the terms of the original contract were paid, the stipulation in this new agreement being:

"But such payment shall not be made until the party of the first part has given bond with approved security conditioned for the return to the party of the second part of the amount so paid, upon demand being made by the Secretary of the Navy therefor, for indemnity of the party of the second part against loss or injury by reason of such payment, and in consideration of such advance payment the party of the first part hereby releases the party of the second part from all and every claim for loss or damage hitherto sustained by reason of any failure on the part of the party of the second part to comply with its contract or on account of any delay hitherto occasioned by the action of said party of the second part."

The time intervening between this agreement and the final completion and delivery of the vessel was one year, six months and nine days, and that time was made the basis for the computation of damages, as will appear hereafter.

On May 18, 1896, after the completion and delivery of the vessel, the balance of the money due on the contract was paid, and a release and receipt executed by the building company in the following terms:

"Whereas, by the eleventh clause of the contract dated November 19, 1890, by and between The William Cramp and Sons Ship and Engine Building Company, a corporation created under the laws of the State of Pennsylvania, and doing business at Philadelphia, in said State, represented by the president of said company, party of the first part, and the United States, represented by the Secretary of the Navy, party of the second part, for the construction of a seagoing coast-line battleship of about ten thousand tons displacement, which for the purpose of said contract is designated and known as 'Coast-line battleship No. 1,' it is agreed that a special reserve of sixty thousand dollars ($60,000) shall be

held until the vessel shall have been finally tried; provided that such final trial shall take place within five months from and after the date of the preliminary or the conditional acceptance of the vessel; and

"Whereas by the sixth paragraph of the nineteenth clause of said contract it is further provided that when all the conditions, covenants, and provisions of said contract shall have been performed and fulfilled by and on the part of the party of the first part, said party of the first part shall be entitled, within ten days after the filing and acceptance of its claim, to receive the said special reserve or so much thereof as it may be entitled to on the execution of a final release to the United States in such form as shall be approved by the Secretary of the Navy, of all claims of any kind or description under or by virtue of said contract; and

"Whereas the final trial of said vessel was completed on the eleventh day of April, 1896; and

"Whereas all the conditions, covenants and provisions of said contract have been performed and fulfilled by and on the part of the party of the first part;

"Now, therefore, in consideration of the premises, the sum of forty-one thousand one hundred and thirty-two dollars and eighty-six cents ($41,132.86), the balance of the aforesaid special reserve ($60,000), to which the party of the first is entitled, being to me in hand paid by the United States, represented by the Secretary of the Navy, the receipt whereof is hereby acknowledged, The William Cramp and Sons Ship and Engine Building Company, represented by me, Charles H. Cramp, president of said corporation, does hereby for itself and its successors and assigns, and its legal representatives, remise, release and forever discharge the United States of and from all and all manner of debts, dues, sum and sums of money, accounts, reckonings, claims and demands whatsoever, in law or in equity, for or by reason of or on account of the construction of said vessel under the contract aforesaid.

"In witness whereof I have hereunto set my hand and

affixed the seal of The William Cramp & Sons Ship and Engine Building Company this eighteenth day of May, A. D. 1896.

[SEAL.] CHAS. H. CRAMP, *President.*

"Attest: JOHN DOUGHERTY, *Secretary.*"

The Court of Claims found for the claimant in the following items and amounts:

| | |
|---|---:|
| The reasonable value for the use of the claimant's yard, machinery and tools, and for superintendence in the construction of the vessel, including the general upkeep of the yard chargeable to the "Indiana," $3,000 per month, making.......... | $54,887.67 |
| The reasonable cost of the proper care and protection of the vessel during the two years' delay, including expense of cleaning the bottom, furnishing material and painting, temporary awnings and tents over caps left for the introduction of turrets, additional scaling to remove rust before painting, electric lighting, keeping up steam to prevent freezing of valves, wetting down decks, going over machinery, and keeping vessel free from snow, dust, ice, and debris from May 10, 1894.... | 36,591.78 |
| Wharfage from May 10, 1894, including the dredging of a basin to accommodate the vessel............................ | 17,808.00 |
| The proportionate expense for the period from May 10, 1894, of the cost of insurance during the two years' delay........ | 26,272.55 |
| | $135,560.00 |

and rendered judgment against the Government for $135,560. From this judgment both parties appealed.

*The Attorney General* and *Mr. Assistant Attorney General Van Orsdel,* with whom *Mr. Charles C. Binney* was on the brief, for the United States:

The final release of May 18, 1896, released the United States from every kind of liability to the contractor which could arise in connection with the building of the "Indiana," including liability (if any such existed) for damages on account of delay in furnishing the armor.

The language of the release, though somewhat fuller than that of the contract, must have been intended to cover the precise ground which the contract stated should be covered.

There was no authority to require a more complete release, and the words actually used cover the ground at least as completely as do the words of the contract.

The contract being for the construction of the vessel and for no other purpose, it follows that a release of claims on account of such construction must be a release to the United States "of all claims of any kind or description under or by virtue of this contract." Such a release must cover every kind of lawful claim of the contractor, against the Government, to which anything that was done under the contract gave rise. A claim for damages on account of delay in delivering the armor was certainly a claim "under or by virtue of this contract," because there could have been no such claim had the contract not been made. It was a claim for damages for the failure of the United States to do what it had contracted to do, and had the United States not so contracted there could have been no such claim. The claim, moreover, had fully accrued six months before the release was made, for the claim is for damages to November 19, 1895, the date of preliminary acceptance, while the release was made May 18, 1896.

The release, being required by the contract itself, was obviously given for a valuable consideration. The contract cannot be cut up into separate parts and one of the claimant's obligations declared to be without consideration, as distinguished from other obligations for which a consideration existed. The release itself shows that $41,132.86 was paid at the time the release was executed, but the consideration was not even limited to this payment.

As to the inherent reasonableness of a provision for a release of all claims, including those for damages due to delay, it should not be forgotten that the contract had provided that a failure to deliver the armor at the proper time should not cause any serious delay. The contractor was entitled to complete the vessel without the undelivered armor, and it is manifest that if it had insisted on doing so, no claim on account of the delay could have arisen.

It cannot be contended that this release was given under duress, in order to secure a payment of money to which the claimant was lawfully entitled. The contract may have turned out to be less profitable than the contractor expected, but the time for objecting to its terms was before it was signed. There is no such thing, in the eye of the law, as duress in merely insisting upon the performance of what a man has freely contracted to do.

*Mr. John C. Fay* and *Mr. Holmes Conrad,* with whom *Mr. Eppa Hunton* was on the brief, for the Cramp Company:

The final receipt was nothing more or less than an acknowledgment of the payment of the balance of the special reserve, and while it was very verbose the multiplicity of words did not change its legal effect.

It was not the result of the adjustment of a disputed or disputable account for every "condition," "covenant," and "provision" of the contract on the part of the Cramp Company had been "performed and fulfilled," and in consideration thereof, and for no other consideration, became entitled to receive the money paid. It is now claimed that this sum of money not only paid this claim, but that it also embraced other distinct claims, to wit, unliquidated damages arising from the breach of the contract on the part of the United States, which were not only not presented or considered, but were of such a character that the Secretary of the Navy had neither the right, authority, or jurisdiction to consider, adjust, or pay. See *Brannan's Case,* 20 C. Cls., 223; *McKees* v. *United States,* 12 C. Cl. 555; *Powers* v. *United States,* 18 C. Cl. 263, 275; *Dunbar* v. *United States,* 19 C. Cl. 493; *McClure* v. *United States* 19 C. Cl. 179; *Dennis* v. *United States,* 20 C. Cl. 119, 121; *Pneumatic Gun Carriage Company* v. *United States,* 36 C. Cl. 71; 4 Ops. Atty. Gen. 327, 367, 6 Ops. 516; Decision of 2d Comptroller, A. D. 1860, §§ 458–464.

The United States has recovered back a payment made

which the accounting officers had no authority or jurisdiction to allow. *McElrath* v. *United States,* 102 U. S. 426.

There was no necessity to protest; a protest would not have had any effect whatever.

The claim for damages here sued for was not a claim "under and by virtue of the contract"; it did not arise by reason of the fulfillment on the part of the Cramp Company of all the conditions, covenants and provisions that it undertook. It arose not under, but by reason of the violation of the contract by the United States.

A receipt even as comprehensive as this does not release such damages as are here claimed, and the general words upon established principles would be limited to the items specified. *Coulter* v. *Board of Education,* 63 N. Y. 365; 1 Edw. Ch. 34; 1 Cowan, 122, and cases there cited.

Here the company was not to receive anything except the balance of the special reserve of the contract price; nothing was to be considered with respect to the final release except for the work provided in the contract, not even the extra work and certainly not the damages for delay. Large amounts of extra work were done, but they were not to be considered or paid for in this accounting.

The second article of the contract provides for extra work and for the ascertainment of its value. Neither the extra work nor the speed premiums were to be embraced in this final receipt; it was a final receipt only for the balance of the contract work, and neither its language nor Article XIX of the contract extends it beyond that. *Fire Insurance Co.* v. *Wickham,* 141 U. S. 577.

A receipt in the exact form of this, and upon a claim arising from delays on the part of the Government in supplying material, was held no bar to the suit in *Pneumatic Gun Carriage Co.* v. *United States,* 36 C. Cl. 71. See also *McLaughlin* v. *United States,* C. Cl.

The case of *Phelan* v. *Mayor,* cited by the United States is not applicable to the case at bar.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

This case turns on the release executed by the building company on May 18, 1896. It is contended by the claimant that it applies simply to claims springing out of the construction of the vessel, and therefore has no application to the matters for which the judgment was rendered against the Government. The word "construction," the company says, is limited to the mere matter of building; that is, the furnishing of materials, the doing of work, and does not include delays or other matters outside the building of the vessel.

To rightly understand the scope of this release we must consider the conditions of the contract, and especially the clause in it which calls for a release. The contract was a large one, the price to be paid for the work and material being over $3,000,000, and the contract was evidently designed to cover all contingencies. Provision was made for changes in the specifications, for penalties on account of delays of the contractor, deductions in price on certain conditions, approval of the work by the Secretary of the Navy, forfeiture of the contract, with authority to the Secretary to complete the vessel. The last paragraph contains the stipulations as to the amounts and times of payment with authority for increase of the gross amount upon certain conditions. The sixth clause of this paragraph makes special provision for the last payment, to be made "when all the conditions, covenants, and provisions of said contract shall have been performed and fulfilled by and on the part of the party of the first part," and "on the execution of a final release to the United States in such form as shall be approved by the Secretary of the Navy, of all claims of any kind or description under or by virtue of said contract." Evidently the parties contemplated and specially provided by this stipulation that the whole matter of the contract should be ended at the time of the final release and the last payment. That which was to be

released was "all claims of any kind or description under or by virtue of said contract." Manifestly included within this was every claim arising not merely from a change in the specifications, but also growing out of delay caused by the Government. The language is not alone "claims under," but "claims by virtue" of the contract—"claims of any kind or description." All the claims for which allowances were made in the judgment of the Court of Claims come within one or the other of these clauses. It may be that, strictly speaking, they were not claims under the contract, but they were clearly claims by virtue of the contract. Without it no such claims could have arisen. Now it having been provided in advance that the contract should be closed by the execution of a release of this scope it cannot be that the company, when it signed the release, understood that some other or lesser release was contemplated. It must have understood that it was the release required by the contract—a release intended to be of all claims of any kind or description under or by virtue of the contract, and that the form of words which the Secretary had approved was used to express that purpose. With that release stipulated for in the contract the company signed the instrument of May 18, 1896, which in terms purported to "remise, release and forever discharge the United States of and from all and all manner of debts, dues, sum and sums of money, accounts, reckonings, claims and demands whatsoever, in law or in equity, for or by reason of or on account of the construction of said vessel under the contract aforesaid." Now whatever limitation may be placed upon the words "for" or "on account of" the construction the provision for the release of all claims and demands whatsoever, "by reason of the construction of the vessel under the contract aforesaid," is a recognition of the contract, and includes claims which arise by reason of the construction of the vessel under it. "By reason of" may well be considered as equivalent to "by virtue of." It is only by reason of the performance of the contract in the construction of the vessel

that these claims arise. But for the contract, and the construction of the vessel under it, there would be no such claims. No payment of extra moneys is necessary to sustain this release. It is under seal, and the contract is itself full consideration. As of significance it must be borne in mind that the release referred specifically to the sixth paragraph of the nineteenth clause of the contract which provided for the character of the release. Indeed the general language of the release itself and the number of words of description in it show that it was the intent of the Secretary of the Navy to have a final closing of all matters arising under or by virtue of the contract.

Stipulations of this kind are not to be shorn of their efficiency by any narrow, technical and close construction. The general language "all and all manner of debts," etc., indicates a purpose to make an ending of every matter arising under or by virtue of the contract. If parties intend to leave some things open and unsettled their intent so to do should be made manifest. Here was a contract involving three millions of dollars, and after the work was done, the vessel delivered and accepted and this release entered, claims are presented amounting to over $500,000. Surely the parties never intended to leave such a bulk of unsettled matters. As bearing upon this matter, it may be noticed that while the release was signed and the contract between the building company and the Government closed on May 18, 1896, this action was not brought until August 10, 1897, nearly a year and a quarter thereafter.

We are of opinion that the parties by the release of May 18, 1896, which was executed in performance of the requirements of the original contract, settled all disputes between the parties as to the claims sued upon.

*The judgment of the Court of Claims is reversed and the case remanded with instructions to enter a judgment on the findings for the defendant.*

Mr. Justice McKenna and Mr. Justice Moody took no part in the decision of this case.