HowRY, Judge,
dissenting from .the conclusions:
This is a proceeding under the equity powers of the court to reform a contract entered into between plaintiff and defendants for the construction of a battleship known as the Massachusetts; and to reform certain intermediate receipts, and especially to reform the terms of a final receipt given to defendants under an agreement for the construction of the vessel.
Immediately upon the signing of the contract plaintiff prepared the necessary drawings and templates according to the design of the agreement, but the Government decided to use nickel steel in the construction of the armor, thereby suspending their use, and delayed the manufacture of the armor. New sets of both had to be prepared and plaintiff supplied the second set within the time required by the contract. Plaintiff proceeded to that stage when the diagonal armor plates were necessary to go further with the Avork. Some of this armor belt was furnished about a year thereafter, but delivery was not completed until 14 months after the armor plates were called for by the contractor. The delivery of other armor was unreasonably delayed and more than a jrear consumed in harveyizing the plates after they had been finished (according to the original plan), growing out of the election of the Government to substitute the harveyized plates for the original plates. Other necessary material wa's not furnished on contract time, causing a delay of two and a half years. By reason of the several delays and defaults on the part of the Government, plaintiff was put to extra cost and expense and subjected to heavy loss and damage by the interruption to its work, thereby making it necessary for the contractor to provide special *540 arrangements in shops for tools and appliances; preparing an extra dock and keeping the same in repair for two years; and for the care and maintenance of the vessel, including coal, wages, covers, extra painting, tug hire, and other like expenditures during the period of delay. Plaintiff was likewise compelled by the Government’s delinquencies to keep the vessel insured and to pay additional premiums therefor, and to borrow money to carry on the work and to pay interest therefor by reason of being deprived of the payments that would have otherwise accrued to it, and which would have rendered the payment of interest on the money borrowed by it unnecessary.
The court is in full accord as to the amount of these items of cost and expenses during the period of delay, and eliminating all claim for interest and every doubtful item the court finds that the actual cost of the care and maintenance of the vessel was $216,000, according to the schedule appearing elsewhere. When the vessel was structurally ready for the trial trip to which, under Article III of the contract, it was entitled without armor (the Government having failed to furnish it), the claimants advised the United States and were prepared to do the necessary temporary work to make it seaworthy for such trial, and upon such trial the claimant company was entitled immediately to a payment of earned money aggregating over $700,000.
The Secretary of the Navy, while admitting and confessing that the delays in the completion of the vessel had been brought about by the default of the United States, refused to permit a trial trip to be made without armor, notwithstanding the provisions of Article III, deeming it to the best interests of the United States to make no trial until the vessel was entirely completed and declined to pay any of the moneys conceded to be earned under the contract unless petitioner would agree to release its claims against the Government on account of its losses and damages. The record shows that at the date of these intermediate receipts, aside from the $730,000 earned on the Massachusetts and withheld because she had had no trial trip, there was due from the United States on other vessels and withheld, on the 10th day of October, 1894, the date of the first receipt, $1,614,013.95, and on the *541 date of the second receipt, February 8,1896, $452,326.12. The contractor thereupon executed to the Secretary certain receipts, but avers a want of consideration and complains that these intermediate receipts were given under stress of the action of the Secretary in refusing payment for moneys actually earned under the work of construction unless the contractor would include in the intermediate receipts language exonerating and acquitting the Government of the amount of the losses inflicted by the nondelivery of the armor.
There is no dispute as to the fact of the Government’s delay and the consequences of that delay to plaintiff, nor is there anjr dispute that the Secretary of the Navy took the intermediate receipts in the belief that the contractor had a remedy either before Congress or in the Court of Claims for its losses growing out of the Government’s delinquencies. But Mr. Cramp was apprehensive at the time the receipts were exacted of and signed by him, and protested vigorously.
At that time, it will be seen hereafter, the Cramps were in considerable financial trouble. They had to pay several thousands of employees to carry on the company’s shipbuilding work and maintain their plant. Under all these circumstances the contractor was obliged to respond to the arbitrary demand of the Secretary according to the department formula in paying for ship construction or abandon its business. As these facts are neither disputed nor denied, and as the intermediate receipts were exacted under an erroneous construction of law, plaintiff insists that the department should not take advantage of its own wrong, not only because of the surrounding circumstances, but also because of the duress and coercion exercised in the matter of these receipts. When the vessel was completed a receipt or final release under the contract was exacted in the manner following the usual departmental form under the contract provision requiring a release. The claimant company insisted that neither the contract provision nor the final release demanded under it was intended by either of the parties thereto to cover damages accruing to the company by reason of the defaults of the Government. Thereupon the company invoked the equity powers of the court to reform both the contract provision and the receipt, should the language be capable of such con *542 struction, and supplemented this effort for reformation by calling the officials of the department charged with the making and carrying out of the contract, including ex-Secretary Tracy and ex-Secretary Herbert, who fully corroborated the company’s contention.
The reform of the final receipt prayed for was denied May 16, 1910 (the writer not being present and taking no part in the decision), in an opinion filed by Peelle, C. J., for the following reasons, viz:
(1) That evidence was not admissible to vary the terms of the contract.
(2) Because the final release was not such a mistake, inadvertence, or accident as the court could relieve, though the claimant company might have mistaken its legal effect.
(3) Because, regardless of the intent of the parties, this court could not give a different construction or interpretation to the language used, as the same language had been considered and passed upon between the same parties in another case. -206 U. S., 118.
Subsequently the cause was remanded for argument upon the following propositions:
(1) Is the contract or the final release thereunder the subject of reformation when the plaintiff could by diligence have protected itself against the mistake which it complains of by securing a provision in the-release reserving for determination by the court the validity of the claims it now asserts, as was done in the case of the Alabama, 216 U. S., 494 ?
(2) If said contract or the final release be the subject of re-formation, is the evidence adduced competent and sufficient therefor ?
• Both parties had liberty to take further testimony, which seems to have been a concession by the court that' parol testimony was admissible.
I .am unable to see how a doubt could ever have existed as to the right to re-form upon proper evidence. Courts of equity would have but little to do in re-forming agreements except for the use of parol testimony outside of the written contract and unless mutual mistakes appear from extrinsic proof in reducing to writing the intention of the parties. Evidence of fraud or mistake is seldom found in the instrument itself.
*543 Parol evidence, as said by Lord Hardwicke in Baker v. Paine, 1 Ves., 456, is not read to contradict the face of the instrument, but to prove a mistake.
The Supreme Court of the United States said in Walden v. Skinner, 101 U. S., 507, that “ Courts of equity afford relief in case of mistake of facts and allow parol evidence to vary and reform written contracts and instruments when the defect or error arises from accident or misconception, as properly forming an exception to the general rule which excludes parol testimony offered to vary or contradict written instruments. Where the mistake is admitted by the other party, relief, as all agree, will be granted if it be fully proved by other evidence.”
“The jurisdiction in equity to decree the correction of errors which have been caused by mutual mistake is firmly established and needs no citation of authority to sustain it.” Zartman v. First National Bank, 216 U. S., 134.
There is a class of written agreements where parol testimony is inadmissible to interpret them. These, for instance, are policies of insurance, which of themselves furnish the only way by which their terms can be waived or changed. The case now before the court is unlike the last class.
Although this court can not exercise some of the peculiar powers of a court of equity — as, for instance, to decree specific performance — it has the equitable power to determine the money relief to which claimants may be entitled, whether arising out of an equitable or legal demand. United States v. Jones, 131 U. S., 18. The jurisdiction to reform under the act of March 3, 1887, 24 Stat., 505, was so well defined in South Boston Iron Works v. United States, 34 C. Cls. R., 174, the Supreme Court in District of Columbia v. Barnes, 197 U. S., 152, approved the opinion of this court, stating this principle and giving the relief prayed for in the Barnes case. Mr. Justice Day in that case said that one having the right to money relief upon a contract mistakenly omitted to be reduced to writing in accordance with the true agreement of the parties has a claim for equitable cognizance, so that the contract should be reformed to meet the intention of the parties and, as corrected, to be adjudged a valid claim.
*544 In United States v. Milliken Imprinting Co., 202 U. S. 173, on appeal from this court, Mr. Justice Holmes said, in referring to the right of this court to take equity jurisdiction under the first section of the act of March 3, 1887, to reform a contract, that the Court of Claims was warranted in taking-such jurisdiction. Though the mutual mistake was not made out in the Imprinting case on the facts there presented, jurisdiction was distinctly recognized, which of necessity carries up the record in the present case for the appellate court to determine from dll the proof the final decision.
The Court of Claims is not bound by special rules of pleading, the main purpose being to arrive at and adjudicate the justice of claims against the United States. The forms of pleading are not of so strict a character as to require omissions to be held fatal to the rendition of such judgment as the facts demand. United States v. Burns, 12 Wall., 254; United States v. Behan, 110 ib., 339; Clark v. United States, 95 ib., 543; United States v. Carr, 132 ib., 650; Wisconsin Central v. United States, 164 ib., 190.
It has appeared that at the outset the majority excluded as incompetent and inadmissible all evidence tending to explain the intent of the parties and the true character of the instrument because the final receipt given could not be varied by parol testimony and because of the decision of the appellate court as to the effect of the naked release. The ground taken in refusing evidence for the purposes indicated and with respect to the matter of mutual mistake being no ground for reformation (practically brought forward in the present opinion of my brethren of this bench) seems so fundamentally erroneous, reasons are now presented from the highest authority to show' to the contrary. No court has gone further than the Supreme Court of the United States (except the highest court in Mississippi) .in overthrowing all three propositions of the majority of the court.
Chief Justice Chase, in an opinion (which alone will carry him into history as a just judge and as worthy of his great office), said for the court over which he presided that evidence could be received to prove that a promise expressed *545 to be for the payment of “ dollars ” without qualifying-words was in fact made for the payment of something other than lawful dollars of the United States. The contract was for the payment of Cbnfederate States treasury notes given for the sale of property in the usual course of business. Confederate notes had never been made a legal tender, and because of that fact it was contended that no evidence could be received to show any other meaning of the word when used in a contract. They had become current as dollars by irresistible force. But the court held that no rule of evidence properly understood required a refusal to admit proof of the sense in which the word “ dollar ” was used in the contract. Evidence was held admissible in order that justice be done. Thorington v. Smith, 8 Wall., 12.
Equity afforded relief where no mistake appeared as to the facts, but where there was a mistaken opinion on the part of ,a public officer, in Mullan v. United States, 118 U. S., 271. There the Secretary of the Interior had approved lists of public land under which selections were made and titles had passed. It was held that these selections could be vacated and titles under them annulled in a suit in equity brought directly for that purpose. The court found that the mistake, although one of law, could be corrected, and relief was accordingly given in a court of equity for the benefit of the United States.
In Patch v. White, 117 U. S., 210, an error in a will was rectified not alone by the context of the will but by parol evidence. There it appeared that a testator had devised certain lots to each of his near relations, and to his brother a lot described as No. 6 in square 403. He then devised to his infant son the balance of his real estate, to consist of certain lots, describing a number of them, but not describing lot No. 3 in square 406. It was held by the court that the testator intended to dispose of all his real estate, and thought he had done so, and that in the devise to his brother he believed he was giving him one of his own lots. On this state of affairs the court held that parol evidence might properly be received to show that the testator did not and never did own lot 6 in square 403, but he owned lot 3 in square 406. This raised a *546 latent ambiguity which the parol evidence, taken in connection with the context of the will, was held sufficient to show that there was an error in the description.
In Hall v. Lafayette Co., 69 Miss., 539, it was held that an agreement- should not fail of execution by reason of ignorance, whether of fact or of law, in expressing intention in the instrument used. There it appeared to have been the intention of all concerned to make a bond covering all kinds of funds, but the parties made a bond covering only county funds. The law required a special bond for school funds, and the default was of school funds. It was held that while equity could not make contracts for parties and where parties, through erroneous views of law, reject one sort of contract and make another, led thereto by a mistaken opinion ,as to the law, as in Hunt v. Rousmanier, 1 Pet., 1, equity would not relieve. But where parties contract for a particular result and intend to effect it and fail to accomplish it, even through ignorance or mistake of law, equity will effectuate the intent. If in putting the agreement into form it fails to express and stipulate for that which the parties understood and intended, a case is made for a court of chancery.
In Hunt v. Rousmanier, supra, the early English principle was enunciated that equity had no power to make agreements for parties and then compel them to execute the same. Belief was denied because one party gave and another party received a power of attorney authorizing the creditor to sell certain property of the debtor and apply the proceeds of sale to the payment of the debt; but the power having become annulled by the death of the debtor, equity could not direct a new security to be given or a lien to be fixed on the property as security for the debt even though the parties acted in ignorance of the rule of law which made the death of the constituent a revocation of the jiower.
In Hall’s case, supra, the whole contract was for funds not taken. The court was asked to enlarge the terms of the bond, so as to include liability for something beyond its promise. The general bond of the defaulting officer was not security for school funds. Nevertheless, the instrument was reformed *547 so as to express the implied thought which the court thought the makers had when they signed the bond. Campbell, Ch. J., who delivered the opinion of the court, was doubtless right in his general statement of the principle, but authority is not wanting against the correctness of the view taken by the court that a penal obligation could be reformed. A penal bond has not generally been considered subject to extension or subject to be enlarged by the act of others, even if the oral agreement be express, much less upon implication, as the bond was reformed on what the court thought was an implied agreement. The Hall case is an extreme one and is cited to show how far respectable courts have gone in the effort to reform written agreements and do substantial justice.
In Gillespie v. Moon, 2 Johns, Ch., 585, Chancellor Kent said that he had looked into most if not all of the cases, and that it appeared to be established that relief could be had against any deed or contract in writing founded in mistake or fraud.
In Snell v. Insurance Co., 98 U. S., 89, the great commentator’s opinion was quoted as the settled law of the Supreme Court, and stated that the court was careful in Hunt v. Rousmanier to say that it was not its intention “ to lay it down that there may not be cases in which a court of equity will relieve against a plain mistake arising from ignorance of law.”
Rules which govern the exercise of the power to reform “ are founded in good sense.” Hearne v. Marine Ins. Co., 20 Wall., 490. This terse statement of the Supreme Court was supplemented by the statement that the mistake must be common to both parties to the instrument. The evidence is clear here that the contract when executed did not contemplate anything except the contract price agreed upon for the construction of the ship. The contract was not executed to be discharged by the arbitrary action of any officer of the Government for breaches of the contract causing losses to the contractor beyond the price agreed upon. Ex-Secretary Tracy declares in his testimony that when the contract was made he did not understand that the contractor was to be *548 called upon, as a condition of its receiving'the contract price payable for the construction of the ship, to release the Government for the breach. Had this secretary been called upon to frame the release, he says he would have excluded the present claim from its operation because of the reservation to himself to frame the releases. Corroborative of his understanding and intent, the secretary testifies that in the case of the Union Iron Works he promptly agreed to pay it monthly the expenses the contractor was put to by reason of delays causing losses. See supplemental contract, p. 12. According to the testimony not only of ex-Secretary Tracy (who further says that he would have cheerfully written the same provision into the Cramp contract) Mr. Nagel testifies that the department was ready to do the same thing for the Cramp company. Ex-Secretary Chandler testifies that he would not have required any release of claims for losses, under the contract, if such losses had been brought about by the default of the Government and the contractor had persisted in his claim in the proper way. What else was more proper than to have accepted in good faith the assurance of Secretary Herbert that relief would be afforded (with the cooperation of the head of the department taking the release) and with the further assurance that the claim for losses remained open for judicial or legislative relief?
Ex-Secretary Tracy’s understanding and intent is further corroborated by his incorporating into the third article of the Cramp contract a provision by which he put upon the United States the expense incident to the care and preservation of the Massachusetts arising out of any delays for defaults on the part of the Government: (1) By covenanting to deliver the armor “ within the time and within the order to carry on the work properly; ” and (2) that in the event of Government failure so to do to accept the vessel without armor. So there is no merit in the contention that Secretary Tracy intended by clause 6 of article 19 to demand a waiver of damages or to compel a release of claims for losses upon the penalty of compelling the contractor to forfeit its claims for nondelivery of the armor on time. Article 3 is explicit with respect to the commencement of the delivery of the *549 armor, and must not be construed to mean that the beginning of delivery was met by sending a single piece of armor of any description because the contract says, “Armor for her side belt, casemates, turrets, redoubts, barbettes, and conning tower.” The intent and purpose of article 3 was the prevention of costs and damages to the Cramps. According to the distinguished head of the Navy Department who made the contract and the evidence of the assistant naval constructor— Lewis Nixon, of world-wide fame — who designed the Massachusetts in competition with experienced experts and navel architects, the contract would have accomplished that purpose had the Government lived up to its agreement.
Admiral Hichborn was charged with the preparation of the specifications for building the vessel and with the details for its construction. He is positive that the proviso was inserted to protect the contractor against loss for any delay. At the time the Government had never before purchased armor. It had no experience, and the making of armor was in the experimental stage. The armor makers had so little experience and the naval architects and experts being without any experience at all, the time of delivery and the quality of the armor became subjects of consideration as to whether armor could be delivered on time or in the order required. The head of the shipbuilding company, according to Admiral Hichborn, expressed great doubt to that officer whether the Government would be able to get the armor, stating to the admiral his apprehensions of delay whilst the Government was holding him up to penalties and the contracting company was getting no corresponding security.
The proviso to the contract came about as the result of a discussion between the Judge Advocate, the Secretary of the Navy, the chief constructor, and the men who were to bid on the contract, and the object was to protect the shipbuilders against loss in case the Government failed to carry out its part of the contract.
Secretary Herbert knew this. As early as March, 1896, vigorous protests against relinquishment of claims for loss and damage inflicted upon the contractor were made to Secretary Herbert.
*550 The Secretary admits this. He had assumed office in March, 1893. That was after the harveyized nickeled steel armor had been unofficially decided upon but before the decision had been officially promulgated.
Negotiations for the armor way before the contract period had expired. The contractors objected because of the lateness of the change and because of the necessity arising to subject the armor to the new process. They said it would delay the completion of the work and entail loss and damage. Ex. Doc. 69; letter Aug. 22, 1893, p. 89. The Secretary of the Navy became possessed of exact knowledge that if the armor should be harveyized in the interest of the United States claims would arise for loss and damage.
The Secretary knew that by the application of the Harvey process “ it would delay completion of the vessel for a long-period of time.” He did not think that the delays would be as great as they subsequently proved to be. After the process was applied it was found difficult, “ almost impossible, if not quite,” to drill holes in the armor with the tools then in hand because of the hardness of the plate and its resistive power. A new process had to be invented annealing plates at points where they were to be perforated. Secretary Herbert says he recognized that the delays “ would increase the cost because of the care, docking, increased insurance,” and other expenditures resulting in claims against the Government for a breach of the contract. But the Secretary adds that he thought the contractor would be remitted either to a court or to Congress, and supports his statement from independent memory as well as by a reexamination of the correspondence. The Secretary is emphatic in the statement that it was not for him to determine the losses and damages of the Cramps after he had decided that the Navy Department had no jurisdiction. Hence the official action with reference to the settlements as the work progressed, and the delays were meantime prolonged. Concurrently with the damages imposed upon the contractor, Cramp & Co. presented claims for their losses. IT. R. Doc. 69, 2d sess. 54th Cong. This shows that both the Secretary and the Cramps *551 were passing receipts which did not in fact include the claims then being presented for relief elsewhere.
When the final receipt was taken Mr. Herbert states positively that he had no intention to include any part of the claim for losses and damage. He acted in accordance with the uniform precedent that his department had no jurisdiction to pass upon this class of claims. In his letter to Congress relating to all the claims of Cramp & Co. — which included the claim of the Massachusetts — the Secretary said that “ the interests of justice demand that they (the claims) should be referred to the Court of Claims, which can consider these matters with more deliberation and care than could be devoted by the committees of the two Houses of Congress.” At the very time this final release was signed under which the balance of the contract price, $51,536.60, was paid, November 23, 1896, there was pending before him under the act of June 10, 1896, the present claim, aggregating $483,757.49 as presented, and within 17 days thereafter he made the report to Congress, above referred to, never suggesting that he had taken 17 days before an absolute relinquishment of the entire claim, although he does specifically call attention to the two partial releases, coupling it with the statement that it was claimed that they were procured by coercion and duress.
After the release the Secretary proceeded to investigate and examine the claims submitted under the act of June 10, 1896.
The senior Cramp corroborates Secretary Herbert, and from the two statements it appears that the same intent was in the mind of Secretary Herbert in taking the receipt as controlled Secretary Tracy in making the contract.
According to Mr. Cramp, Secretary Herbert never intimated that under the contract the contractor was obliged to submit to the increased expense in the care and maintenance of the vessel (Rec., 67) arising out of the breach. There was no understanding, agreement, or suggestion either on the part of the Secretary of the Navy or the contracting company that the final receipt given in November covered in any manner claims for losses submitted September 30, 1896.
*552 Under that rule of construction, that circumstances surrounding the execution of written instruments affect the subjects to which the circumstances relate and which may properly be resorted to for aid in determining the meaning of the words employed, the case seems complete as to the meaning of the final receipt.
So that, whatever view may be taken of the effect of the intermediate receipts pending the construction of the ironclad, there is nothing left to doubt as to the matter of mutual mistake with reference to the meaning and effect of the final receipt in all good conscience and law, if human testimony be the subject of belief.
It seems that Secretary Herbert was considering reference’ for settlement of losses sustained by the Cramps for the Government’s breach of the contract to the Court of Claims when the final receipt was taken. That is the unmistakable evidence.
It must be understood that when final payment was due under the contract the Secretary of the Navy did not claim to have jurisdiction to settle the company’s demands for its losses growing out of the failure of the Government to deliver armor for the ironclad. The Secretary had refused to make advances because he did not feel that he had the right, as an executive officer, to modify the original agreement without a new consideration. Consequently the Secretary refused to make partial payments unless the contracting company would give him a bond'not only for the refunding, if necessary, of all advances then made, but would accompany this bond with a release of all claims for damages that might have accrued before that time on account of the company’s claim that the Government had delayed the builders in the completion of the work. Mr. Cramp insisted that the Secretary “ should not take advantage of his circumstances in that way.” That was in 1894. The company was financially embarrassed at that time. It appears that it was in need of .funds and a working capital to carry on its business. Its indebtedness was steadily increasing, and the stringency of the money market was most pronounced during the year that the payments on the contracts were due. The fact, even if it *553 was a fact, that the company had. on its hands unprofitable contracts upon merchant ships and ships built for other Governments than that of the United States, aggregating very heavy sums, is not a circumstance to be considered as diminishing the fact of the company’s financial embarrassments; but rather a fact to more than prove the straitened circumstances which in the year 1894 confronted the Cramps, but unfortunately the testimony of the witness which the Government relies on gives the list of vessels on which, according to his memory, the Cramps lost money, which on comparison with his testimony given in the case of the Maine, No. 26,398 (which was read without objection at the hearing), shows that not one of the vessels mentioned was in the yard in 1894, nor for more than four years after, the first arriving in 1897 and the last in 1901.
Though defendants allege that dividends were paid on the capital stock outstanding from October, 1894, to February, 1896, these dividends had not been earned. If dividends had not been paid, the contractor’s credit would, perhaps, have been wholly impaired with banks. It is certain that the company was in distress and was experiencing much difficulty in extending its loans. Money to carry on the business was badly needed, and this fact was brought to the attention of the Secretary of the Navy at the time the payments were made to it and at a time when the Secretary was refusing to pay anything unless the company would release its claims for damages. The record is full of testimony that the Cramps were heavy borrowers of money. It is historical that there was a scarcity of money in the country at the time. The financial condition of the Cramps was such at the time that it was impossible for the company to raise money except on its contract for the building of this particular ship and two sister ships. The effort to show that the financial embarrassments of the Cramps were due to unprofitable contracts outside of the building by the company of ironclads for the Government does not change the well-established fact that at the time these intermediate receipts were given the company was on the verge of bankruptcy. In this state of affairs, and after much discussion *554 and the continual insistence upon the part of Mr. Cramp that the refusal to pay the money without conditions was equivalent to “ a hold-up on the plains,” the receipts were signed as demanded by the Secretary.
Secretary Herbert’s view that he must obtain a consideration for the change of contract stipulation as to partial payments is distinctly shown by the decision of the Supreme Court in the case of the Alabama to have been erroneous because the appellate court commended Secretary Long for the alteration of the terms of the contract and distinctly affirmed his right and power to change it.
Add to the foregoing conditions the fact that the Secretary of the Navy had the arbitrary power in case progress on the part of the contractor was unsatisfactory to him to declare the contract forfeited, it will be readily seen that the Cramps were in the power of the official acting so unjustly. The contractor was completely at the mercy of the official. The Secretary of the Navy and the president of the contracting company did not stand on equal terms against an ultimatum which required the company to subject itself to a forfeiture of its contract or to execute a receipt surrendering its rights.
The proof is clear and positive that the Secretary had knowledge of the fact that the Cramps could not carry on their business unless they could get money, and that the money had been earned, and at the time the intermediate receipts were given the Cramps could not obtain the cash anywhere else.
The acceptance of a less amount of money by reason of financial embarrassment was coercion where the party paying was apprised of the situation and had himself done something that caused the embarrassment. Wheeler v. Smith, 9 How., 55; United, States v. Huckabee, 16 Wall., 414; Swift v. United States, 111 U. S., 32 and cases cited; Robertson v. Frank, 132 ib., 23; R. R. Co. v. Oonn., 98 U. S., 543; United States v. Lee, 101 ib., 196.
Early decisions respecting duress required the employment of physical force or threats of violence that would frighten and intimidate the most courageous. The cases cited sub *555 stantially follow the later doctrine which Judge Cooley so well declares in Hackley v. Headley, 45 Mich., 469, when the said that “ Duress exists where one, by the unlawful act of another, is induced to make a contract or perform an act under circumstances which deprive him of the exercise of free will.”
The present case for damages relates to the Massachusetts. It is a wholly different case from that of the Indiana, 206 U. S., 126. The latter case was an action at law, and the appellate court was unaided by any extraneous evidence as to the technical meaning of the word “ construction ” as used in the contract, and assumed the intent of the parties in the matter of the releases from the erroneous belief that the claim had not been presented until about a year and a quarter after the execution of the final receipt. Said the Supreme Court: “As bearing upon this matter it may be noticed that while the release was signed and the contract between the building company and the Government closed on May 18, 1896, this action was not brought until August 10, 1897, nearly a year and a quarter thereafter.” It was not the appellate court’s fault that the matter of further claim was deemed an afterthought, because it was further said by the court — dealing with supposed claims of more than a half million of dollars — that by the execution of the receipt the parties “ surely never intended to leave such a bulk of unsettled matters.” The case of the Indiana turned “on the release.” If the court had been made aware that the claim was not an afterthought; that it was asserted at the very beginning; that it had been refused cognizance by the Secretary of the Navy for want of jurisdiction; that Congress had directed an examination of the claim, and that it was pending before the Secretary of the Navy at the very time the release was signed and favorably reported by the head of the Navy Department to Congress within a few days thereafter, it is reasonably certain the court could not have reached the conclusion it did. The inferences of the court clearly appear to have been based not only on the evidence not now presented, but on the erroneous assumption that the Cramp claims were without merit, gotten up for the special purpose of defrauding the Government.
*556 I take my full share of the responsibility for the decision of this court in the matter of the construction of the Indiana. The release was thought by this court not to extend to any matter which was not the subject of negotiation between the contractor and the Secretary of the Navy. In this respect I thought with my associates that the execution of a receipt releasing the claims which the Secretary of the Navy had no jurisdiction to settle was not like the release of an amount due by judgment. Section 1092 Revised Statutes provides that the payment of the amount due by any judgment of the Court of Claims shall be a full discharge to the United States of all claim and demand touching any of the matters “ involved ” in the controversy.
In the case of the Alabama, 216 U. S., 494, the appellate court sustained the judgment of the Secretary of the Navy in refusing to settle claims for unliquidated damages on the ground that as an executive officer he was without authority to settle for them. Under a proviso to a release which did include claims arising under a contract under the terms of which the Secretary of the Navy did not have jurisdiction to entertain, the contractor was held not to be barred from prosecuting his demands for unliquidated damages before the Court of Claims. The case of the Alabama was reversed because this court did not follow two decisions of its own in order to give effect to the proviso. (This writer did not hear the case of the ATbama and took no part in its decision.)’
An examination of the case of the Alabama, likewise of the Indiana, discloses that there was no proof in this court or the higher court of what the parties intended except what the face of the written agreements disclosed. There was no effort to reform according to the intention. There was no attempt to explain the use and meaning in the receipt given for “ the construction ” of the ship. Both cases involved claims for unliquidated damages. Plaintiff by the language used and the failure to present extraneous proof had mistakenly restricted the court to the literal terms of the releases. The meaning of both decisions, in the last analysis, determines that although claims for unliquidated damages required for their settlement the application of the qualities of judgment and discretion, executive officers were without *557 jurisdiction to settle such claims. But yet, a receipt waiving such damages by a claimant was good and there was power in an executive officer to change the terms of the release if such damages by the stereotyped departmental form of release in the work of construction were agreed to be released by written instrument entered into between the parties.
There is no estoppel. When the intermediate receipts were exacted and taken upon conditions like those at bar, there can be no estoppel. The grounds of estoppel against plaintiff here are not nearly so strong as against defendants, and in this respect the case is not unlike that of Sturm v. Boker, 150 U. S., 337. A party is not estopped from asserting his claim unless his conduct has either damaged the Government or caused it to change its position by the acquiescence, silence, or other conduct of the claimant. Alforcl v. United States, 95 U. S., 356. Estoppel operates to prevent the truth from being heard where a claimant by his conduct has made it unconscionable for him to assert it. In this matter nothing was done to the detriment of the Government. Estoppels must always be reciprocal. Herman, sec. 328, 8 Wend., 480.
Nor is there any question of diligence or of laches. Where a party seeking relief has unreasonably delayed application for redress or where the circumstances raise the presumption that he acquiesces in the written agreement, equity may decline to grant relief. Graves v. Boston Marine Ins. Co., 2 Cranch, 419. With knowledge by the Government that a claim was pending for all the damages and losses when the final receipt was given, that it was a matter understood and acted upon by both parties to the final receipt at the time it was signed, and that the claims were under investigation as separate demands and were to remain open to settlement in the proper forum, there is eliminated any question of diligence.
There is nothing in any action heretofore taken on cases at law asking reimbursement for losses which prevents the court from reforming the contract and the receipts given thereunder. In a proceeding in equity to reform a general bond to include all kinds of funds a judgment at law can not be pleaded as res judicata. Hall v. Lafayette *558 County, 69 Miss., supra. There is nothing to preclude the court from now reforming the writings of the parties according to the intent.
But as this is an .equity case to reform written instruments this court can not prevent a review of all the facts by limiting its findings to matters within the discretion of the trial tribunal. The rules touching the effect of the findings do not apply from the adjudication of this court on a claim which requires it to exercise equity jurisdiction to do justice. Harvey v. United States, 105 U. S., 671; United States v. Old Settlers, 148 U. S., 464.
As there is some question as to the sufficiency and extent of the duress and coercion when the intermediate receipts were given I will not say that plaintiff company is entitled to have relief against the settlement covered by these intermediate receipts although the Cramps were put to the alternative of sustaining loss under their contract by the withholding on the part of the Secretary of the Navy of moneys partly due under the contract unless the Cramps would execute these intermediate receipts.
But as to the final receipt .and the amount then paid the right of the plaintiff company to relief seems to me to be entirely clear. On this last proposition I am willing to stand because the evidence fully justifies the conclusion. The appellate court can not be restricted by the findings here because the case now is one of equitable procedure.
While it is the duty of the courts to protect the Treasury against unjust demands, it is equally obligatory upon the judiciary when the truth is ascertained to give it effect to prevent wrong to individuals who deal with the United States. ;0ur Government should not build battleships and be permitted to escape the consequences of its delinquencies. While this observation might w^ell go. without saying, it is said, because this writer does not believe that anyone would more readily afford relief on the whole record as it is now presented than the late Mr. Justice Brewer, who wrote the opinions in the case growing out of the contract for the construction of the Indiana as well as for the construction of the Alabama.