LITCHFIELD MANUFACTURING CORPORATION, in Liquidation, Holly Corporation, Distributee in Liquidation of Litchfield Manufacturing Corporation, formerly Lynch Brothers, Incorporated

v.

The UNITED STATES.

No. 453–56.

United States Court of Claims.

Oct. 16, 1964.

Kahl K. Spriggs, Washington, D. C., for plaintiff. Ellis, Houghton & Ellis, Washington, D. C., on the briefs.

Richard R. Molleur, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. William L. Davis, Washington, D. C., on the brief.

Before JONES and WHITAKER, Senior Judges, and LARAMORE, DURFEE and DAVIS, Judges.

LARAMORE, Judge.

Lynch Brothers, Incorporated,[1] (hereinafter called Lynch or plaintiff), was the low bidder on a contract with defendant through the Navy Department Aviation Supply Office, for the furnishing of some 10,135 fuel tanks, for use on various aircraft, at the unit price of $113.67 or a total of $1,152,045.45. The contract was awarded to plaintiff on April 13, 1950, and was terminated for default by the contracting officer on October 24, 1950, on the ground that plaintiff had so failed to make progress as to endanger performance of the contract.[2]

The contract provided for *desired* delivery dates, the first being 120 days after date of the contract and continuing at intervals, the last being 381 to 410 days after the date of the contract.[3] The contract also provided for the furnishing by the government of a substantial amount of defendant-owned tooling and dies.[4] At the time the instant

---

[1]. Lynch Brothers, Incorporated, a Connecticut Corporation, by amendment to its charter changed its name to Litchfield Manufacturing Corporation. The duration of such corporation was by amendment to its charter terminated on July 29, 1955, and the assets of the corporation were on that day transferred to Holly Corporation, a Delaware corporation, the sole stockholder, in complete liquidation of Litchfield, which brings the action here.

[2]. The contracting officer acted pursuant to section 15 of the contract which provides, in pertinent part, as follows:
"Section 15. TERMINATION FOR DEFAULT
"(a) Whenever the Contractor
 *      *      *      *      *
"'(2) otherwise defaults in the performance of this contract or so fails to make progress in the prosecution of the work hereunder as to endanger performance of this contract in accordance with its terms and fails to cure such default or failure within a period of 10 days (or such longer period as the contracting officer may allow) after receipt from the contracting officer of a notice specifying the default or failure,'
the Government. * * * may by a notice in writing to the Contractor terminate the performance of work under this contract in whole or in any part."
Notice of the intent to terminate for default was sent plaintiff on October 11, 1950.

[3]. On August 3, 1950, the contracting officer offered plaintiff an extension of time on the desired delivery dates. However, plaintiff did not accept such an extension because it felt that the amount of time granted would not be adequate.

[4]. "Section 25. GOVERNMENT-FURNISHED MATERIAL
"(a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the material or equipment which the Schedule or the specifications state the Government will furnish (hereinafter referred to as the "Government-Furnished Material'). Title to the Government-Furnished Material shall remain in the Government. The delivery dates for the articles to be furnished under this contract are based upon the expectation that the Government-Furnished Material will be delivered to the Contractor at the times stated in the Schedule or if not so stated in sufficient time to enable the contractor to meet such delivery dates. In the event that any Government-Furnished Material is not delivered to the Contractor at such times, the contracting officer shall, if requested by the Contractor, make a determination of the delay occasioned the Contractor thereby, and shall grant to the Contractor a corresponding extension of time for the completion of performance. The Government shall not be liable to the Contractor for damages or loss of profit by reason of any delay in delivery of or failure to deliver any or all

contract was awarded to plaintiff, this government-owned equipment was located at the plants of three government contractors who were producing for defendant the same type of tanks which plaintiff was to supply. Under the contract, the tooling and dies were to be delivered by defendant to plaintiff at or near plaintiff's plant in Pine Meadows, Connecticut, for use in connection with the work to be performed. The contract did not specify any particular dates upon which delivery of the tooling and dies were to be made. However, it contained a clause which provided for an equitable adjustment under the "Changes" provision of the contract in case that the tanks could not be produced without the government-furnished material.[5] There is no dispute in this case that the tanks could not be produced without the government-furnished tools and dies and this fact was known by the plaintiff and defendant. As stated earlier, at the time the contract was awarded to the plaintiff, a vast majority of the necessary tooling was still in use by the various government contractors. Plaintiff

was completely unaware of this, although this fact was known to defendant. It was not until July that the last of the necessary tooling was delivered to plaintiff—almost four months after the contract was entered into.

In this case, plaintiff seeks to recover $76,496.11,[6] as compensation for the wrongful termination for default by defendant of its contract.[7] Plaintiff contends that its inability to perform the contract stems from the fact that defendant unduly delayed in delivering the government-owned tooling and dies to be used as government-furnished materials in connection with the work to be performed under the contract. Consequently, plaintiff, in effect, argues that since its inability to perform under the contract is due to causes beyond its control, the termination for default is to be converted pursuant to paragraph (g) of section 15 of the contract into a "Termination at the Option of the Government"[8] and, as such, it is entitled to recover what amounts to termination costs.[9] Defendant, on the other hand,

of the Government-Furnished Material, except that in case of such delay or failure, upon the request of the Contractor, an equitable adjustment shall be made in accordance with the terms and procedure provided in the Section of this contract entitled 'Changes'."

5. Supra, footnote 4.

6. The Commissioner has found that in the performance of work up to the time of the termination for default, plaintiff had spent the sum of $76,496.11. This amount has been verified by defendant pursuant to pretrial procedures under Rules 28(b) (2) and 28(b) (3) and is not in dispute in this case.

7. Plaintiff appealed to the Armed Services Board of Contract Appeals, the contracting officer's termination for default under the "Disputes" article of the contract. The parties, by stipulation, have agreed to waive their rights to go before the Board and seek direct adjudication of their claims by us.

8. Paragraph (g) of section 15 entitled "Termination for Default" provides as follows:

"(g) In the event that a Notice of Termination under this Section has been de-

livered to the Contractor and it thereafter is determined that the default or failure is due to causes beyond the control and without the fault or negligence of the Contractor, performance of work under this contract shall be deemed to have been terminated, effective date of the Notice of Termination, pursuant to the Section entitled 'Termination at the Option of the Government,' and the rights and obligations of the parties shall in such event be governed by said Section."

9. We are not concerned here with the situation which confronted us in Klein v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961), and Goldwasser v. United States, Ct.Cl., 325 F.2d 722, decided December 13, 1963. In those cases we allowed breach of contract damages where the contracting officer wrongfully terminated for default government contracts which were *not* in default. Here plaintiff is seeking termination costs (no portion of the sum claimed includes a profit factor) on the grounds that although it was in default, its default was caused by defendant's actions.

contends that even if there was an unreasonable delay on the part of the government (which it denies) plaintiff's failure to perform under the contract does not stem from the alleged delay but was attributable to its inability to obtain the necessary financing which in turn was due to its poor financial position. To this plaintiff replies that its inability to get the necessary financing was due to the worsening of its financial position occasioned by the government's failure to supply the necessary tooling, since during this period the plant was practically idle, resulting in unproductive overhead. Defendant has asserted a counterclaim to recover its excess costs incurred by reason of the repurchase of the contract.

■ There are certain factors present in this case which clearly bring into focus the legal and factual questions which, we think, are controlling in this case. It is clear from the entire record that at the time defendant terminated plaintiff's right to proceed under the contract for default, plaintiff was not in a position to complete performance under the contract.[10] It is also clear that plaintiff's inability to perform under the contract was ultimately due to its failure to obtain the necessary financing.[11] However, it is equally clear to us as plaintiff contends that defendant unreasonably delayed in delivering the government-furnished material without which plaintiff could not start production under the

contract. In this respect we note that the government did not supply plaintiff with all of the necessary tooling until four months after the contract was awarded to plaintiff, although on repeated occasions plaintiff notified defendant that it needed prompt delivery of the tooling. Defendant knew or should have known that the necessary tooling would not be available within a reasonable time after the contract award, since this same tooling was still in use by the other government contractors. Furthermore, the defendant has not shown any outside intervening factor which prevented it from a prompt delivery. Under such circumstances, we think that defendant negligently failed to furnish the required materials in time so that plaintiff could economically perform the contract. This, we think, constitutes a breach on the part of the government of its obligation under section 25 of the contract. See Peter Kiewit & Son Co., Inc. v. United States, 151 F.Supp. 726, 731, 138 Ct.Cl. 668, 674–675 (1957) and cases cited therein.[12] Cf. Commerce International Co., Inc. v. United States, Ct.Cl., 338 F.2d 81, this day decided. The defendant cannot cure its breach here by the simple expedient of extending the time of delivery. William Cramp & Sons Ship & Engine Bldg. Co. v. United States, 41 Ct.Cl. 164 (1906) reversed on other grounds, 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907). Whether it constitutes a material breach converting the termination for default to one for con-

10. In reply to defendant's notice of intention to terminate for default plaintiff stated that "[w]e must admit that we have failed to show sufficient progress to indicate that we will be able to maintain the delivery schedule."

11. The decision of the bank not to finance the project forced plaintiff to ask for an arrangement under chapter XI of the Bankruptcy Act. Under such a situation plaintiff's materialmen and subcontractors refused to deliver the material and subassemblies to plaintiff.

12. In the past we allowed recovery in the Kiewit line of cases based on an implied obligation on the part of the government not to willfully or negligently interfere with the contractor in the performance of his contract. In allowing breach of contract damages, we required plaintiff to show negligent or willful conduct on the part of defendant in failing to promptly make available government-furnished materials. In those cases, the "government-furnished material" clause did not contain a provision for an equitable adjustment in the event of a government delay. Since in this case we find that there was a breach on the part of the government under the test postulated in Kiewit, we do not go into the effect of the "equitable adjustment" provision in a situation where the contractor fails to prove negligent conduct on the part of the defendant.

venience, depends on whether or not plaintiff was ready, willing and able to perform the contract when the breach occurred. See Donnell-Zane Co. v. United States, 75 Ct.Cl. 368 (1932); Brundage v. United States, 66 Ct.Cl. 708 (1929). The answer to this, we think, depends on whether or not plaintiff could have obtained the necessary financing at the time the alleged breach occurred.

■■ The financial ability and capacity of a contractor to perform a government contract is generally a matter within his control and responsibility. Therefore, inadequate financial resources which lead to a default in performance of the contract do not generally excuse nonperformance and as a result the government is absolved of any liability under the contract. See McBride & Wachtel, Government Contracts, § 36.20. However, financial ability to perform a government contract does not mean that the contractor must have on hand adequate cash to pay for the entire cost of performance. Nor can we require the small government contractor to have at its disposal the same financial resources as the giant industrial institution. We think the contractor must have available at the time of the contract award reasonable financial resources in the light of business custom and practice either on hand or through its customary lines of credit, to finance the expected cost of production. See Appeal of West Coast Lumber Corp., ASBCA 1131, 6 C.C.F. 61477 (1953).

■ At the time the contract was entered into plaintiff's financial position was weak. Without a very substantial loan, it would have been impossible for

plaintiff to perform the contract in suit. Plaintiff was aware of this and during the months prior and subsequent to the awarding of the contract, plaintiff sought financial assistance from various lending institutions. Defendant was also aware of plaintiff's financial position and knowing this, nevertheless, awarded the contract to the plaintiff. The Bristol Bank and Trust Co., plaintiff's source of financing on prior occasions, stated, in a letter to the Navy, that it would arrange to make the necessary funds available to plaintiff. The Bank's vice-president, who also represented the Bank on plaintiff's board of directors, testified that the bank was ready to make the necessary funds available to plaintiff. He testified further that the bank declined to finance the instant contract because of the delays by defendant in delivering the tooling, causing plaintiff's plant to become and to remain virtually idle during this period which in turn aggravated plaintiff's already precarious financial position.

■■ Defendant would have us ignore this testimony. It argues that plaintiff's failure to obtain the necessary financing did not stem from the government delay but was attributable to plaintiff's poor financial position. Defendant in support of this contention has introduced into the record financial statements of plaintiff showing that at the time the subject contract was awarded to plaintiff, it had a deficit of current assets over current liabilities.[13]

As stated earlier, there is no doubt that plaintiff's financial position was very strained. However, plaintiff has introduced testimony from a bank official that

---

13. Our Trial Commissioner has found that, nevertheless, the bank was willing to make the necessary funds available to plaintiff. This factual determination by our Trial Commissioner who had the opportunity to judge the credibility of the witness shall be presumed to be correct (Rule 48, now Rule 66) unless defendant makes a strong affirmative showing to the contrary. Here plaintiff has introduced specific testimony of a witness which supports the recommended finding.

Defendant has countered with a theoretical argument in support of its position that the bank would not have made the necessary funds available because of plaintiff's poor financial position. Under these circumstances, we must accept the trier's evaluation. Davis v. United States, Ct.Cl. No. 179-50, decided February 14, 1964, slip op. pp. 4-5; Commerce International Co., Inc. v. United States, Ct.Cl., 338 F.2d 81, this day decided.

in spite of this the bank was willing to make the necessary funds available to plaintiff. There are certain factors in the record which seem to buttress this testimony. The bank officer, on cross-examination, indicated that the type of financing which was contemplated was based on the assignment of the government contract to the bank. He stated that in this type of security arrangement the bank looks more to the ability of the contractor to perform the contract, rather than the applicant's financial position. The record discloses that plaintiff's physical facilities were more than adequate to perform the contract. Defendant itself confirmed this on its pre-award survey of plaintiff's plant. Moreover, immediately after the contract award, plaintiff enlarged and adapted its physical facilities to the expected government equipment. The bank official further testified that in determining the contractor's ability to perform the contract, the bank looked to see if the subject contract was adequately bonded. The record discloses that the Hartford Accident and Indemnity Company furnished a $200,000 performance bond to defendant conditioned upon the faithful performance of the contractor. He indicated that this factor would counteract the detrimental effect of the deficit in plaintiff's financial position.

It is apparent to us from the entire record that at the time of defendant's breach the bank was willing to make the necessary funds available to plaintiff in spite of the fact of plaintiff's strained financial position. Moreover, because of the nature of the security arrangement, the bank had to have assurances that the performance of the contract could be started before it could enter into the loan arrangement. When defendant failed to deliver the necessary tooling on time, the bank declined to make the necessary funds available. This in turn caused plaintiff's default. Consequently, we must find that plaintiff's default was from causes beyond its control or negligence, and as a result the termination for default is to be converted into a "Termination at the Option of the Government" pursuant to paragraph (g) of section 15 of the contract. See Appeal of Facs Products, Inc., ASBCA Nos. 3336 and 3601, 57–1 BCA 1215 (1957). Accordingly, judgment is entered for plaintiff in the amount of $76,496.11. Defendant's counterclaim is dismissed.